IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL EXPORTS, INC., §
SUZANNE ITANI, and ZIAD ITANI, §
    10820 Train Court §
    Houston, TX 77041, §
     §
    *Plaintiffs*, §
     §
v. §    CIVIL ACTION NO. <u>1:14-CV-2064</u>
     §
CHUCK HAGEL, IN HIS OFFICIAL §
CAPACITY AS SECRETARY OF THE §
DEPARTMENT OF DEFENSE; §
THE DEFENSE LOGISTICS AGENCY; §
MARK D. HARNITCHEK, VICE §
ADMIRAL, SC, IN HIS OFFICIAL §
CAPACITY AS THE DIRECTOR OF §
THE DEFENSE LOGISTICS AGENCY; §
and FRED PRIBBLE, §
IN HIS OFFICIAL CAPACITY AS §
THE SPECIAL ASSISTANT FOR §
CONTRACTING INTEGRITY OF THE §
DEFENSE LOGISTICS AGENCY, §
    1000 Defense Pentagon,
    Washington, D.C. 20301,

    *Defendants*.

## ORIGINAL COMPLAINT

This is an action seeking to void the arbitrary, capricious and impermissibly punitive

decision of the Defense Logistics Agency ("DLA") to stigmatize and debar[1] Plaintiffs

---

[1] The Plaintiffs were debarred from procurement, nonprocurement and sales programs. This debarment precludes the Plaintiffs from (1) bidding on or being awarded contracts from the U.S. Government (whether purchasing products/material from or supplying products/material to the U.S. Government), (2) conducting business with U.S. Government as an agent or representative of a contractor, (3) effectively receiving any subcontract, (4) participating in any nonprocurement transactions (*e.g.* grants, cooperative agreements, contracts of assistance, loans, loan guarantees, and subsidies). Further, the Plaintiffs' names were added to the U.S. Government's website that lists them as being debarred along with the reasons for debarment. Access to this website is not limited to government agencies, but may be accessed by anyone. A copy of the DLA's Memorandum Decision debarring the Plaintiffs is attached hereto as Exhibit 1.

International Exports, Inc., Suzanne Itani, and Ziad Itani from government contracting for a period of 15 years—five times longer than provided by the applicable law—based on their mere association with an individual who pled guilty to certain wrongs vis-à-vis the government in relation to other contracts.  The individual defendants are each sued in their official capacities: Chuck Hagel as Secretary of Defense; Vice Admiral, SC, Mark D. Harnitchek as the agency head of the DLA; and Fred Pribble as the Special Assistant for Contracting Integrity of the DLA.  Plaintiffs International Exports, Inc., Suzanne Itani, and Ziad Itani state as follows:

# I.
## INTRODUCTION

1.    This case arises out of the DLA's arbitrary and capricious application of a guilt-by-association standard of debarment to International Exports, Suzanne Itani, and Ziad Itani.  The DLA's actions have stigmatized, and continue to stigmatize, International Exports, Suzanne Itani, and Ziad Itani.  Yet, the DLA's imposition of such serious sanctions was not based on substantial evidence in the record, was arbitrary and capricious, and was done without a legal basis, without due process of law, and not in accordance with the law or the applicable regulations, including, but not limited to, Federal Acquisition Regulations ("FAR") 9.402(b), 9.406-1, 9.406-2, 9.406-3, 9.406-4, and 9.406-5.[2]

2.    Suspension and debarment of a contractor from federal procurement and nonprocurement programs are serious, stigmatizing actions.  *See* 48 C.F.R. § 9.402(b); *see also*, *Caiola v. Carroll*, 851 F.2d 395, 401 (D.C. Cir. 1988) (noting that even after a debarment has expired, the debarment may cause a "lingering stigma" to an individual).  Accordingly, suspension and debarment must be imposed only in limited circumstances and for limited time

---

[2] A copy of the Federal Acquisition Regulations effective September 23, 2011 is attached as Exhibit 2 to this Complaint.

frames.  *See* 48 C.F.R. § 9.402(b).  Further, a contractor, subcontractor or affiliate may only be debarred for actual wrongful conduct.  *See* 48 C.F.R. § 9.406-2.

3.     The debarments at issue in this case arose after Suzanne Itani's husband, Samir Itani, pleaded guilty to criminal conduct involving one of his businesses.  Following that conviction, the DLA began a cascade of punitive actions:

a.     First, the DLA debarred Samir Itani for engaging in the wrongful conduct for which he had been convicted.

b.     Next, the DLA imputed Samir Itani's wrongful conduct to numerous businesses that he controlled and for which he was also the Chief Executive Officer ("CEO").

c.     But the DLA did not stop there.  Instead, contrary to FAR, it debarred Suzanne Itani based only on her alleged affiliation with companies associated with Samir Itani, and not for any wrongful conduct (actual or imputed) or knowledge of such conduct by Suzanne Itani.  Instead, the DLA made a conclusory finding without a substantial evidentiary basis that Suzanne Itani controlled or could control certain entities, and debarred her on that basis.

d.     Similarly, contrary to FAR, the DLA barred Ziad Itani based only on his alleged association with one company associated with Samir Itani, and not for any wrongful conduct (actual or imputed) or knowledge of such conduct by Ziad Itani.  Instead, the DLA made a conclusory finding without substantial evidentiary basis that Ziad Itani was an "affiliate" because he allegedly controlled or could control an entity to which the DLA imputed wrongful conduct.

e.     And, contrary to FAR, the DLA's cascading punishment continued, as it debarred International Exports, but without making any finding of a cause for its debarment.  Indeed, International Exports is only mentioned in the DLA's findings as having an affiliation with Suzanne Itani, which is cited as a "cause for *her* debarment."  The DLA mentioned no affiliation between International Exports and Samir Itani, much less found that International Exports had any involvement in the wrongs for which he pleaded guilty.

f.     Further, after it had debarred International Exports in an order that praised the company's hiring of a new Chief Financial Officer ("CFO") to improve and assure responsibility, the DLA instituted debarment proceedings *against that very CFO*, withdrawing the proceedings only when the CFO resigned from International Exports.

4.      Moreover, the DLA impermissibly debarred International Exports, Suzanne Itani, and Ziad Itani for the same 15-year period that Samir Itani was debarred.  In so doing, the DLA disregarded and provided no basis for departure from the three-year statutory limit for debarment, made no findings that a 15-year period represented the time that *any* of the Plaintiffs (much less each and every one of them) would fail to be responsible contractors, and provided no explanation or basis for concluding that Plaintiffs (who were not found to have engaged in or even to have known of wrong-doing) deserved the same debarment as Samir Itani, whose criminal conviction began the cascade of punitive debarments.  The 15-year debarment of Plaintiffs goes beyond a mere remedial measure to protect the government's interest and is an excessive, punitive penalty that is prohibited by FAR.

5.      The net effect of the DLA's action is that International Exports, Suzanne Itani and Ziad Itani have suffered and will suffer the stigma of debarment for 15 years, even though none was found to have committed or had knowledge of a single culpable act.

6.      The debarments of International Exports, Suzanne Itani, and Ziad Itani are arbitrary and capricious, an abuse of discretion, not based on substantial evidence, and otherwise not in accordance with the law or applicable regulations.  For these reasons, the debarments must be set aside.

## II.
## PARTIES

7.      Plaintiff International Exports, Inc. is a Texas corporation, with its principal place of business in Houston, Harris County, Texas.

8.      Plaintiff Suzanne Itani is an individual residing in the State of Texas.

9.      Plaintiff Ziad Itani is an individual residing in the State of Texas.

10.     Defendant Chuck Hagel is the Secretary of the United States Department of Defense.  In his official capacity, he resides at 1000 Defense Pentagon, Washington, D.C. 20301-10.  The Secretary is responsible for the actions of the DLA.  Secretary Hagel may be served in his official capacity by first serving the United States by (a)(i) delivering of a copy of the summons and of the complaint to the United States attorney for the District of Columbia or an assistant United States attorney or clerical employee whom the United States attorney for the District of Columbia has designated in a writing filed with clerk of the District of Columbia, or (ii) sending a copy of the summons and of the complaint by registered or certified mail to the civil-process clerk at the United States attorney's office and (b) sending a copy of the summons and of the complaint by registered or certified mail to the Attorney General of the United States at Washington, D.C. and second serving Secretary Hagel by sending a copy of the summons and of the complaint by registered or certified mail to Secretary Hagel at 1000 Defense Pentagon, Washington, D.C. 20301-10.

11.     Defendant DLA is an agency of the United States Department of Defense organized pursuant to 10 U.S.C. § 191, with its principal place of business at 8725 John K. Kingman Road, Fort Belvoir, Virginia 22060.  Defendant DLA is an executive agency within the meaning of the Administrative Procedures Act ("APA").  The DLA may be served by first serving the United States by (a)(i) delivering of a copy of the summons and of the complaint to the United States attorney for the District of Columbia or an assistant United States attorney or clerical employee whom the United States attorney for the District of Columbia has designated in a writing filed with clerk of the District of Columbia, or (ii) sending a copy of the summons and of the complaint by registered or certified mail to the civil-process clerk at the United States attorney's office and (b) sending a copy of the summons and of the complaint by registered or

certified mail to the Attorney General of the United States at Washington, D.C. and second serving the DLA by sending a copy of the summons and of the complaint by registered or certified mail to the DLA at 8725 John K. Kingman Road, Fort Belvoir, Virginia 22060.

12.     Defendant Mark D. Harnitchek, Vice Admiral, SC is the Director of the DLA. Defendant Harnitchek is being sued in his official capacity as the agency head of Defendant DLA.  In his official capacity, he resides at 8725 John K. Kingman Road, Fort Belvoir, Virginia 22060.  Vice Admiral Harnitchek may be served in his official capacity by first serving the United States by (a)(i) delivering of a copy of the summons and of the complaint to the United States attorney for the District of Columbia or an assistant United States attorney or clerical employee whom the United States attorney for the District of Columbia has designated in a writing filed with clerk of the District of Columbia, or (ii) sending a copy of the summons and of the complaint by registered or certified mail to the civil-process clerk at the United States attorney's office and (b) sending a copy of the summons and of the complaint by registered or certified mail to the Attorney General of the United States at Washington, D.C. and second serving Vice Admiral Harnitchek by sending a copy of the summons and of the complaint by registered or certified mail to Vice Admiral Harnitchek at 8725 John K. Kingman Road, Fort Belvoir, Virginia 22060.

13.     Defendant Fred Pribble is the Special Assistant for Contracting Integrity employed by the DLA in Fort Belvoir, Virginia.  Defendant Pribble is being sued in his official capacity as the Special Assistant for Contracting Integrity for the DLA.  In this capacity, he resides at 8725 John K. Kingman Road, Fort Belvoir, Virginia 22060.  Mr. Pribble may be served in his official capacity by first serving the United States by (a)(i) delivering of a copy of the summons and of the complaint to the United States attorney for the District of Columbia or

an assistant United States attorney or clerical employee whom the United States attorney for the District of Columbia has designated in a writing filed with clerk of the District of Columbia, or (ii) sending a copy of the summons and of the complaint by registered or certified mail to the civil-process clerk at the United States attorney's office and (b) sending a copy of the summons and of the complaint by registered or certified mail to the Attorney General of the United States at Washington, D.C. and second serving Mr. Pribble by sending a copy of the summons and of the complaint by registered or certified mail to Mr. Pribble at 8725 John K. Kingman Road, Fort Belvoir, Virginia 22060.

### III.
### JURISDICTION AND VENUE

14.     This action arises under the APA, 5 U.S.C. §§ 701-706.

15.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331, 1346 and 2201. An actual and justiciable controversy exists between Plaintiffs and Defendants as to which Plaintiffs require declaratory relief.

16.     The relief requested is authorized by 5 U.S.C. § 702 (APA); 28 U.S.C. § 1651 (All Writs Act); 28 U.S.C. § 2201 (Declaratory Judgment Act); 28 U.S.C. § 2202 (further relief); and the United States Constitution.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (e) because the District of Columbia District Court is a convenient forum.  Chuck Hagel, in his official capacity as Secretary of the Department of Defense, resides in the District of Columbia.  The DLA is an agency of the Department of Defense.

18.     Subject matter jurisdiction is proper under the APA because Defendants' actions in imposing debarment are arbitrary, capricious, an abuse of discretion, unsupported by

substantial evidence, and otherwise not in accordance with law and applicable regulations. 5 U.S.C. §§ 702, 706.

19.     Subject matter jurisdiction is proper under the APA because the alleged conduct does not warrant the sanction imposed. 5 U.S.C. § 706.

20.     Subject matter jurisdiction is proper under the APA because Defendants' actions exceed their statutory authority. *Id.*

21.     Subject matter jurisdiction is proper under the APA because Defendants' actions contradict the Federal Acquisition Regulations.

22.     Subject matter jurisdiction is proper under the United States Constitution (Violation of Constitutional Due Process), including the Fifth Amendment.

23.     All prerequisite actions to the filing of this matter have occurred.

## IV.
## FACTS

**A.     Background on the Companies and Individuals Discussed in the Debarment Memorandum**

24.     Suzanne Itani is the wife of Samir Itani. She was born and raised in Mississippi.

25.     During the early 1990s, Suzanne Itani assisted Samir Itani in starting a business called International Grocers, Inc. ("International Grocers") that focused on international commercial exports of grocery-related products to businesses in the Middle East. Samir Itani ran all phases of International Grocers, including operations, marketing, and sales, and Suzanne Itani only handled accounting type functions; Suzanne Itani was not involved in the management of the business.

26.     With a growing young family to raise, Suzanne Itani effectively left the business and hired an accountant to take over her role at International Grocers. Suzanne Itani then turned her full attention to family matters. From the mid-1990's until approximately 2009, Suzanne

Itani did not play any role in International Grocers or the other companies Samir Itani created, developed, managed, and expanded.  Rather, her personal involvement in International Grocers and the other companies—American Grocers, Inc., American Grocers, Ltd., and S&S Itani dba American Grocers ("S&S Itani")—was minimal to non-existent during this time period. Suzanne Itani maintained no set work schedule or regular operational position within any of the companies.  When necessary, she came in to sign the payroll or checks when Samir Itani was on a business trip.  The DLA's administrative record included no evidence to the contrary.

27.     On the other hand, Samir Itani was at the forefront of International Grocers, American Grocers, Inc., American Grocers, Ltd., and S&S Itani.  He was the CEO of all of these business entities, and the only person controlling these companies.  The DLA's administrative record included no evidence to the contrary.

28.     International Grocers was incorporated in 1993.  In 1999, International Grocers formally changed its name to American Grocers, Inc. American Grocers, Inc. then converted to American Grocers, Ltd. in February 2000.  S&S Itani was incorporated in October 2003 and in January of 2004 began doing business as American Grocers.  From January of 2004 onward, American Grocers Ltd. served as an employment leasing agency to S&S Itani.  Both S&S Itani and American Grocers, Ltd. were terminated December 29, 2011. The corporate history of International Grocers, American Grocers, Inc., American Grocers, Ltd., and S&S Itani is summarized in the following chart:

| Year | Company | Status of Company |
|------|---------|-------------------|
| 1993 - 1999 | International Grocers, Inc. | Name amended to American Grocers, Inc. |
| 1999 - 2000 | American Grocers, Inc. | Converted to American Grocers, Ltd. |
| 2000 - 2011 | American Grocers, Ltd. | Terminated in 2011 |
| 2003 - 2011 | S&S Itani | Terminated in 2011 |

29.     Ziad Itani is the brother of Samir Itani.  Ziad Itani completed his education only through the eighth grade.  Ziad Itani was born in Lebanon, and he immigrated to the United States from Lebanon in 1998 and began working at International Grocers.  Ziad Itani had no role in or responsibility for managing or running any of Samir Itani's companies, and, consequently, did not control any of these entities.  The DLA's administrative record included no evidence to the contrary.

30.     Suzanne Itani did not want to be associated with Samir Itani's companies and determined to close down S&S Itani and other entities.  She formed International Exports on or about March 16, 2010.  She formed the company when it became apparent that Samir Itani would be incarcerated, and she would have to reenter the work force.  The prime motivating factor was Suzanne Itani's need to establish a means of income to support her family of which two children were in college at that point in time.  Ziad Itani became the sales manager at International Exports.

**B.     Background of Debarment**

31.     The DLA issued a memorandum of decision, in which it purported to debar Suzanne Itani and Ziad Itani because it found that they were "affiliates" of stated entities and that

such affiliation purportedly provided "a separate and independent cause" for debarment under FAR 9.406-2(c). The DLA's findings identified no cause for International Exports' debarment; its affiliation with Suzanne Itani was mentioned, but was cited only as a cause for *her* debarment. There was no finding of any wrongdoing on the part of Suzanne Itani, Ziad Itani or International Exports. As the basis for its debarment decision, the DLA relied upon (a) the guilty plea of Samir Itani, (b) the Superseding Criminal Information against Samir Itani, (c) allegations in a *qui tam* complaint, (d) an unsubstantiated, hearsay PowerPoint presentation prepared by the *qui tam* relator's counsel, and (e) 2007 D&B Business Information Reports. (*See* Ex. 1) However, this information does not establish substantial evidence to support a cause for debarment. The DLA's decision and the lack of evidentiary support for the debarments of the Plaintiffs are discussed in detail below.

### 1.    The Criminal Investigation of Samir Itani

32.    Beginning in 2005, Samir Itani's activities were investigated by several agencies and departments of the United States government: the U.S. Department of Defense-Defense Criminal Investigative Service in Houston, the U.S. Army Criminal Investigations Major Procurement Fraud Section in San Antonio, the U.S. Department of Agriculture Office of Inspector General in Houston, and members of the National Procurement Fraud Task Force created by the Department of Justice in October 2006.

33.    The genesis of the U.S. Government's investigation was alleged information Delma Pallares ("Pallares") provided to the U.S. Government sometime in or prior to August 2005. Pallares provided the alleged information regarding Samir Itani's purported activities to the U.S. Attorney's Office and U.S. Department of Agriculture's ("USDA") special agents prior

to filing her original *qui tam* complaint against Samir Itani and three entities[3] that he controlled in August 2005 (the "2005 *Qui Tam* Case").[4]  The original *qui tam* complaint was kept under seal while the U.S. Government investigated and determined whether to intervene.  International Exports, Suzanne Itani, and Ziad Itani were not defendants in the original *qui tam* complaint.

34.     Pallares alleged in the original *qui tam* complaint that American Grocers, Inc. sold expired and possibly contaminated food that had a short shelf-life to the U.S. military serving in the Middle East.  She further alleged in the original *qui tam* complaint that Samir Itani purchased out-of-date food products and changed their expiration dates, forged USDA health/export certificates and Halal documents (Islamic Slaughter Certification), and sold food "possibly infected with such contaminates as mad cow disease."

35.     As part of the government's investigation, in September 2006 twenty-three (23) federal agents from the various U.S. government agencies raided facilities allegedly used by American Grocers, Ltd. and S&S Itani, entities controlled by Samir Itani.

36.     During and as a result of the 2006 raid, the federal agents (a) took numerous photographs of the warehouse facilities and operations allegedly used by Samir Itani's entities, including pictures of the products located in the warehouse that were scheduled to be exported by Samir Itani's entities to the Middle East ("Export Products"), (b) confiscated the books and records of at least American Grocers, Ltd. and S&S Itani, including all computer and email files, as well as employee cell phones, and (c) seized various materials, including the Export Products themselves.

---

[3] The entities were International Grocers, Inc., American Grocers, Ltd. and American Grocers, Inc.  However, American Grocers, Inc. ceased to exist in approximately 2000 when it was converted into American Grocers, Ltd.

[4] Plaintiffs' Original Complaint Pursuant to 31 U.S.C. §§ 3729-3732, Federal False Claims Act, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018 (S.D. Tex. August 26, 2005), ECF No. 2.

37.     The federal agents also held American Grocers, Ltd.'s and S&S Itani's employees for approximately six hours as part of the 2006 raid and would not permit any of the employees to leave the facilities.  During this time, the federal agents interrogated the employees without the employees having the benefit of counsel.

38.     The federal agents also interrogated Samir Itani as part of their 2006 raid.

39.     Subsequent to the raid, various federal agents made surprise visits to the homes of some of the S&S Itani and American Grocers, Ltd. employees for further questioning.

40.     To further investigate the activities of Samir Itani, the U.S. Government subpoenaed records of S&S Itani's suppliers to further evaluate allegations of "shelf-life" fraud and tainted food, including whether any conspiracy existed between S&S Itani and its suppliers as to the alleged "shelf-life" fraud claim.  Interestingly, given the scope of the U.S. Government's investigation, it never interviewed Suzanne Itani or asserted that she was involved in any alleged wrongful conduct.

## 2.     The Criminal Investigation Did Not Uncover Any Evidence of "Shelf-Life" Fraud or Contaminated Food.

41.     Despite a surprise raid and an extensive federal investigation involving several U.S. Government agencies and a significant amount of manpower exclusively targeted on the "shelf-life" fraud and contaminated food allegations alleged in the 2005 *Qui Tam* Case, the U.S. Government failed to uncover or otherwise identify any evidence of "shelf-life" fraud or the sale of tainted food.  Thus, when the United States finally did indict Samir Itani on July 23, 2007, ten months after its 2006 raid, it was for the alleged submission of overcharges, including alleged

false trucking charges, under 18 U.S.C. §286 ("2007 Indictment").[5]  This claim was not even mentioned in the original complaint filed in the 2005 *Qui Tam* Case.[6]

42.     Consequently, for all of the scintillating and salacious allegations made in the original complaint in the 2005 *Qui Tam* Case about Samir Itani selling expired, short shelf-life, and tainted food (including food contaminated with "mad cow disease") to the U.S. military, not a single one of the allegations in the 2005 *Qui Tam* Case made its way into the 2007 Indictment. Nor did the Government charge that American Grocers, Ltd. or S&S Itani sold any expired, short shelf-life, or contaminated food for ultimate purchase by the U.S. Government, despite the U.S. Government's comprehensive investigation that, by the date of the 2007 Indictment, had included at least (a) the materials and Export Products confiscated from American Grocers, Ltd. and S&S Itani during the 2006 raid, (b) numerous pictures of materials and Export Products at the facilities of American Grocers/S&S Itani, (c) the confiscated books and records of American Grocers, Ltd. and S&S Itani (including all computer and email files), (d) dozens of employee interviews, and (e) records subpoenaed from the various suppliers of American Grocers, Ltd./S&S Itani.

43.     Two years later, on or about July 20, 2009, the United States filed a Superseding Criminal Information against Samir Itani for Conspiracy to Defraud the Government, which only alleged that Samir Itani overcharged by including a distribution fee, false trucking costs and for allegedly failing to pass on vendor discounts.[7]  The Superseding Criminal Information claimed

---

[5] Indictment, *United States v. Itani*, No. 4:07-cr-00310 (S.D. Tex. July 23, 2007), ECF No. 1.

[6] *See* Plaintiffs' Original Complaint Pursuant to 31 U.S.C. §§ 3729-3732, Federal False Claims Act, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018, ECF No. 2.

[7] Superseding Criminal Information, *United States v. Itani*, No. 4:07-cr-00310 (S.D. Tex. July 20, 2009), ECF No. 109.

that the alleged conspiracy ran from February 13, 2004, through September 8, 2006.[8]  The entire timeframe of the alleged conspiracy occurred many months **after Pallares left the employment of Samir Itani's companies**, demonstrating that she had no personal knowledge of those alleged events.[9]

44.     The Superseding Criminal Information admits that a Kuwaiti company named Public Warehousing Company K.S.C. ("PWC") was the prime vendor for the three contracts awarded by the U.S. government that were at issue.[10]  The contracts identified in the Superseding Criminal Information are:

    a.     SPO300-03-D-3061, awarded on or about May 28, 2003

    b.     SPM300-05-D-3119, awarded on or about February 17, 2005; and

    c.     SPM300-05-D-3128, awarded on or about July 5, 2005.[11]

45.     Neither Samir Itani nor any of the entities that he controlled were the prime vendor for any of the contracts that were the subject of the Superseding Criminal Information.[12]

46.     The Superseding Criminal Information identifies American Grocers, Inc. as the only entity owned by Samir Itani that sold products that were supposedly sold ultimately to the U.S. government by PWC.  The Superseding Criminal Information also concedes that American Grocers, Inc. was, at best, only a subcontractor of PWC.[13]  Further, the Superseding Criminal Information additionally concedes that another Kuwaiti entity named The Sultan Center ("TSC") was a subcontractor for PWC that was a higher-tier subcontractor than American Grocers, Inc.

---

[8] *Id.* at p. 5, ¶17.

[9] *Compare id.* at p. 5 ¶17 *with* Plaintiffs' Original Complaint Pursuant to 31 U.S.C. §§ 3729-3732 at p.4 ¶10, Federal False Claims Act, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018, ECF No. 2.

[10] Superseding Criminal Information at pp. 2-4, ¶¶4-11, *United States v. Itani*, No. 4:07-cr-00310, ECF No. 109.

[11] *Id.* at p. 2, ¶5.

[12] *Id.* at pp. 2-4, ¶¶4-14.

[13] *Id.* at p. 4, ¶12.

such that TSC allegedly acquired products from American Grocers, Inc. that TSC purportedly would resale to PWC.[14]  Thus, American Grocers, Inc. would at best be a tertiary subcontractor according to the Superseding Criminal Information.  Similarly, the 2009 amended complaint in the 2005 *Qui Tam* Case also alleges that American Grocers was a tertiary subcontractor.[15]

47.     The U.S. Government contracts cited in the Superseding Criminal Information involved the procurement of food products that were commercially available off-the-shelf items.[16]  That is, the food products were (a) commercial items, (b) sold in substantial quantities in the commercial marketplace; and (c) in the same form in which they were sold in the commercial marketplace.  The contracts cited in the Superseding Criminal Information did not include bulk cargo, as defined in 46 U.S.C. § 40102(4).

48.     On July 21, 2009, the day following the issuance of the Superseding Criminal Information, Samir Itani entered into a plea agreement with the United States that was duly signed and approved by an Assistant United States Attorney on behalf of the Government.  As part of the plea agreement, Samir Itani pleaded guilty to Conspiracy to Defraud the Government with Respect to Claims in violation of 18 U.S.C. § 286 asserted in the Superseding Criminal Information.  Samir Itani pleaded guilty for alleged wrongful conduct occurring between 2004 and 2006 and purportedly involving American Grocers, Inc.  However, American Grocers, Inc. ceased to exist in 2000 when it converted to American Grocers, Ltd.  The United States District Judge for Samir Itani's criminal case granted the motion for acceptance of the plea agreement on December 4, 2009.  Samir Itani was sentenced on December 3, 2010.

---

[14] *Id.* at pp. 4-5, ¶14.

[15] Relator Delma Pallares's First Amended Complaint at pp. 7-8, ¶27, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018 (S.D. Tex. June 10, 2009), ECF No. 27.

[16] Motion to Dismiss Indictment at Ex. 1, Ex. 2, *U.S.A. v. The Public Warehousing Company K.S.C.*, 1:09-cr-00490 (N.D. Ga. Feb. 21, 2012), ECF Nos. 256-2 – 256-30.

49.     Even though the U.S. Government had an additional two years to investigate its claims against Samir Itani from the issuance of the 2007 Indictment, the 2009 Superseding Criminal Information, like the 2007 Indictment, made no allegations of selling expired, short shelf-life, or contaminated food to the U.S. Government.[17] Again, not a single allegation from the 2005 *Qui Tam* Case original complaint made its way into the Superseding Criminal Information.

50.     Also, after the U.S. Government's massive criminal investigation, neither Suzanne Itani nor Ziad Itani was indicted, or even threatened with indictment.  Additionally, no criminal proceedings were ever initiated against S&S Itani or American Grocers, Ltd., much less against International Exports, which did not exist until four years after the alleged wrongful conduct occurred.

### 3.     The U.S. Government and the 2009 Amended *Qui Tam* Complaint Establish that the Allegations in the 2005 *Qui Tam* Case Are Unreliable and Hearsay.

51.     On June 10, 2009, the relator, Pallares, amended the original complaint in the 2005 *Qui Tam* Case.[18]   The 2009 amended *qui tam* complaint still included the salacious and scintillating allegations of the original complaint, but it also added new claims that simply copied those alleged by the U.S. Government in the 2007 Indictment and added Suzanne Itani and Ziad Itani, along with numerous entities, as defendants.[19]   However, Pallares' 2009 amended *qui tam*

---

[17] *See* Superseding Criminal Information, *United States v. Itani*, No. 4:07-cr-00310, ECF No. 109.

[18] Relator Delma Pallares's First Amended Complaint, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018, ECF No. 27. Suzanne Itani and Ziad Itani were never served with either the 2005 original complaint or 2009 amended complaint in the 2005 *Qui Tam* Case and neither entered an appearance.

[19] *See* Relator Delma Pallares's First Amended Complaint, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018, ECF No. 27. International Exports was not a defendant in the 2005 *Qui Tam* Case.

complaint made no specific allegations of any wrongdoing or knowledge of wrongdoing by either Suzanne Itani or Ziad Itani.[20]

52.     Further, the materials submitted to the DLA show that Pallares lacked personal knowledge of the allegations of wrongdoing made in the 2009 amended *qui tam* complaint (as well as the 2005 original complaint). Pallares herself admits that she left the employment of American Grocers in June 2003, and the alleged wrongful conduct she supposedly identifies occurred after her departure.[21]

> a.     **The 2005 *Qui Tam* Case Allegations Are Not Supported by the Alleged "Evidence" Cited by Pallares and Are Contradicted by the USDA.**
>
> (1)     **No "Expired Food" or "Short Shelf-Life Food" was sold**

53.     It is undisputed that several agencies and groups within the U.S. Government investigated the "short shelf-life" fraud and tainted food claims (as well as the other claims) alleged in the 2005 *Qui Tam* Case, both as originally alleged and as amended.

54.     The U.S. Government's investigation lasted for nearly four years.

55.     Despite analyzing all the information it gathered, the U.S. Government "was stumped in trying to show that dates were altered on particular items shipped to the military."[22]

56.     All of the purported "facts" set forth in the 2009 amended *qui tam* complaint and PowerPoint presentation are completely uncorroborated and speculative. Indeed, the PowerPoint presentation is not a document prepared or maintained by Samir Itani, any of his entities, or any of the Plaintiffs. It was instead a summary of what Pallares's lawyers argued.

---

[20] *See* Relator Delma Pallares's First Amended Complaint, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018, ECF No. 27.

[21] *Id*. at pp. 6, ¶23, 11-17.

[22] *See* Opinion and Order at p. 19, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018 (S.D. Tex. July 2, 2010), ECF No. 79.

57.     For example, in the PowerPoint presentation Pallares's lawyers identified several documents that contain a handwritten and/or typewritten notation "S/L" and numbers.  They argued that these notations were meant to be instructions to extend the shelf-life of products being shipped.  But no evidence or testimony in the administrative record indicated as much.  Instead, those notes reflect instructions to ***shorten*** the shelf-life on products to meet the shorter shelf-life requirements of countries in the Middle East.  For example, the import laws and regulations of the Gulf Cooperation Council ("GCC") (which includes Saudi Arabia and Kuwait) provide a specific limit of only 18 months for the shelf-life of all canned vegetables and fruits[23], while USDA publications provide that low-acid canned vegetables can be safely stored on a shelf from 2 to 5 years.[24]  Similarly, while the GCC shelf-life for frozen beef, chicken and turkey is limited to 12 months, USDA publications state that frozen meat stays safe indefinitely.[25]  Consequently, the shelf-life of the products Samir Itani sold to his customers in the Middle East ***had to be shortened*** to meet the shelf-life limitations provided by the import laws and regulations of the Gulf Cooperation Council.

58.     Additionally, the 2009 amended *qui tam* complaint is not evidence, but uncorroborated accusations that distort the actual facts of Samir Itani's operations.  For example, Pallares makes various allegations about Samir Itani supposedly misrepresenting the shelf-life of turkey.  Pallares cites a USDA article and alleges that "most cooked turkey products should have

---

[23] Gulf Cooperation Council, Gulf Standard No. 150/1992, Expiration of Food Products – Part 1 (1992).

[24] USDA, Shelf-Stable Food Safety at p. 9, http://www.fsis.usda.gov/wps/wcm/connect/77ffde83-dc51-4fdf-93be-048110fe47d6/Shelf_Stable_Food_Safety.pdf?MOD=AJPERES (last updated August 2014); *see* USDA, Shelf-Stable Food Safety at p. 9, http://www.fsis.usda.gov/wps/wcm/connect/77ffde83-dc51-4fdf-93be-048110fe47d6/Shelf_Stable_Food_Safety.pdf?MOD=AJPERES (issued May 2011) (on March 31, 2014, as maintained by the "Wayback Machine," https://web.archive.org/web/*/http://www.fsis.usda.gov/wps/wcm/connect/77ffde83-dc51-4fdf-93be-048110fe47d6/Shelf_Stable_Food_Safety.pdf?MOD=AJPERES, last visited Oct. 17, 2014).

[25] Gulf Cooperation Council, Gulf Standard No. 150/1992, Expiration of Food Products – Part 1 (1992); USDA, Freezing and Food Safety at pp. 1, 5, http://www.fsis.usda.gov/wps/wcm/connect/cce745c9-0fc9-4ce6-a50c-84363e5b5a48/Freezing_and_Food_Safety.pdf?MOD=AJPERES (last revised May 2010).

freezer storage lives of only four months and lunch meats have freezer storage lives of only one to two months."[26]  But the USDA article she cites (as well as other articles by the USDA) states that **"product dates are not a guide for safe use of a product."**[27]  Indeed, the USDA specifically advises that "if frozen continuously, turkey products will be safe indefinitely."[28]

59.    In fact, the entire premise of the shelf-life fraud claims in Pallares' 2005 *Qui Tam* Case (including in its amended form) is refuted by USDA materials explaining that **federal regulations do not require product dating** for the products that Samir Itani's companies sold.[29] Additionally, the USDA has also pointed out that "open dating" on products is not a "safety" date.[30]

60.    Additional USDA publications further note that when stores and/or food processors **voluntarily date packages**, they use one of several types of dates:

a.    "Sell-By" date – This date tells the store how long to display the product for sale. The product should be purchased before the date expires.  These products should be cooked or frozen before the "sell by" date.

b.    "Best if Used By" date – This date is recommended for best flavor or quality.  It is not a purchase or safety date.

c.    "Use-By" date – This date is the last date recommended for the use of the product while at peak quality. A retailer may legally sell fresh or processed meat and poultry beyond the expiration date on the package as long as the product is wholesome.[31]

---

[26] Relator Delma Pallares's First Amended Complaint at p. 12, ¶36, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018, ECF No. 27.

[27] USDA, Turkey from Farm to Table at p. 4, http://www.fsis.usda.gov/wps/wcm/connect/d67abe8d-02a2-4852-b943-f05e89a9248d/Turkey_from_Farm_to_Table.pdf?MOD=AJPERES  (last revised Aug. 2010).; *see* USDA, Food Product Dating at p. 2, http://www.fsis.usda.gov/wps/wcm/connect/19013cb7-8a4d-474c-8bd7-bda76b9defb3/Food_Product_Dating.pdf?MOD=AJPERES (last revised Aug. 2013).

[28] USDA, Turkey from Farm to Table at p. 4, http://www.fsis.usda.gov/wps/wcm/connect/d67abe8d-02a2-4852-b943-f05e89a9248d/Turkey_from_Farm_to_Table.pdf?MOD=AJPERES (last revised Aug. 2010).

[29] USDA, Food Product Dating at p. 1, http://www.fsis.usda.gov/wps/wcm/connect/19013cb7-8a4d-474c-8bd7-bda76b9defb3/Food_Product_Dating.pdf?MOD=AJPERES (last revised Aug. 2013).

[30] *Id.*

[31] *Id.*

61.     The USDA has also published that "[o]nce a perishable product is frozen, it doesn't matter if the date expires because **foods kept frozen continuously are safe indefinitely**."[32]

62.     For shelf-stable food products (*i.e.*, foods that can be safely stored at room temperature or "on the shelf"), the USDA promulgates a shelf-storage chart for various commercial shelf-stable food products that shows that shelf storage can range from 1 to 5 years, depending on the product.[33]  Further, the USDA has pointed out that shelf-stable products can be safely used after the "sell-by" date or "use-by" date.[34]  Pallares' 2005 *Qui Tam* Case ignores these USDA publications because they demonstrate that there is no factual basis for her alleged shelf-life fraud claims.

63.     Pallares next claims that PWC—the prime vendor for the three contracts under which Samir Itani's companies provided products for ultimate sale to the United States— instructed its subcontractors that products had to have an 80% shelf-life at time of shipment, **unless otherwise agreed** by PWC.[35]  However, the contracts with the U.S. Government that were the subject of Samir Itani's criminal case do not have such a requirement.  For example, contract SPO300-03-D-3061 provides:

> **Land-Based Customers:** No product shall be delivered to customers with less than **30 days** manufacturer's original shelf life remaining unless the customer grants prior written approval.  (emphasis added)

---

[32] *Id.* at p. 2 (emphasis added).

[33] USDA, Shelf-Stable Food Safety at pp. 9-10, http://www.fsis.usda.gov/wps/wcm/connect/77ffde83-dc51-4fdf-93be-048110fe47d6/Shelf_Stable_Food_Safety.pdf?MOD=AJPERES (last updated August 2014); *see* USDA, Shelf-Stable Food Safety at pp. 9-10, http://www.fsis.usda.gov/wps/wcm/connect/77ffde83-dc51-4fdf-93be-048110fe47d6/Shelf_Stable_Food_Safety.pdf?MOD=AJPERES (issued May 2011) (on March 31, 2014, as maintained by the "Wayback Machine," https://web.archive.org/web/*/http://www.fsis.usda.gov/wps/wcm/connect/77ffde83-dc51-4fdf-93be-048110fe47d6/Shelf_Stable_Food_Safety.pdf?MOD=AJPERES, last visited Oct. 17, 2014).).

[34] *Id.* at p. 4.

[35] Relator Delma Pallares's First Amended Complaint at p. 10, ¶32, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018 (S.D. Tex. June 10, 2009), ECF No. 27.

**Navy Direct Ship Support:** No product shall be delivered to customers with less than **60 days** manufacturer's original shelf life remaining unless the customer grants prior written approval.[36]

64.     Further, no evidence shows that any of the food supplied by Samir Itani for ultimate delivery to the U.S. Government had less than 80% of its shelf-life at the time of shipment.

65.     Finally, the evidence shows that there was no opportunity to allegedly change the expiration dates of the products that the U.S. Government allegedly ultimately purchased from Samir Itani.  It is undisputed that either PWC or TSC—PWC's subcontractor that stood one tier above American Grocers, Inc. and acquired products from Samir Itani's entities for resale to PWC—arranged for the vast majority of such products to be source loaded directly at the product manufacturer's facilities.  That is, the products never went to Samir Itani's warehouse because PWC or TSC arranged for the products to be picked up at the manufacturer's facilities.[37]

### (2)     No Evidence of Falsified Certificates

66.     The record before the DLA did not contain any allegedly "fake" Halal certificates relating to purported U.S. Government purchases.  Moreover, the U.S. Government contracts that were the subject of the Superseding Criminal Information *did not require any Halal certificates*.

    a.      As part of the formation of Contract SPO300-03-D-3061, the Defense Supply Center Philadelphia ("DSCP") responded in writing to questions posed by the various bidders including a question regarding whether a Halal certificate was required.  The DSCP responded, in part, "The U.S. Military does not catalog halal items.  Refer to page #22 of solicitation, Paragraph #22 – Status of Forces Agreement (SOFA)."[38]

---

[36] Motion to Dismiss Indictment at Ex. 1, part 1, p. 34, *U.S.A. v. The Public Warehousing Company K.S.C.*, 1:09-cr-00490 (N.D. Ga. Feb. 21, 2012), ECF No. 256-2 (emphasis added).

[37] Opposed Motion to Correct Sentence Under Federal Rule of Criminal Procedure 35(a) at Ex. A, pp.6-7, ¶10, *United States v. Itani*, No. 4:07-cr-00310 (S.D. Tex. Dec. 16, 2010), ECF No. 201-2.

[38] Motion to Dismiss Indictment at Ex. 1, part 4, p. 105, *U.S.A. v. The Public Warehousing Company K.S.C.*, 1:09-cr-00490 (N.D. Ga. Feb. 21, 2012), ECF No. 256-5.

b.   Further, in Contract SPM300—05-D-3128, the paragraph entitled "Status of Forces Agreements" provides "[s]hipments to the zones are subject to whatever country-to-country agreements may exist between those countries and the United States."[39]

c.   The import requirements attached as Exhibits 32 and 34 to the 2009 amended *qui tam* complaint provide that Halal certificates are not required for food imported for U.S. personnel.[40]   The Saudi Arabian import requirements provide: "Shipment for U.S. personnel. - The Certificate of Islamic Slaughter may be waived if products are shipped for consumption by U.S. personnel in Saudi Arabia."[41]   The Kuwait import requirements provide: "Military Shipments. The Kuwait Ministry of Foreign Affairs may exempt shipments consigned to the U.S. military from local import regulations."[42]

67.   The only Halal certificate used by Pallares in her PowerPoint presentation shows that the recipient is "Ammak Al Muhitat Trading Est.," an entity that has nothing to do with PWC, TSC or the United States military.  Further, aside from Pallares's assertions, there is nothing to indicate that the Halal certificate is fake.  And this Halal certificate came into existence several months *after* she left Samir Itani's employment, eliminating the possibility of her having any personal knowledge regarding the certificate.

68.   Similarly, the only USDA certificate used by Pallares in her PowerPoint presentation shows that the recipient of the products is "American International Co.," who is located in Cairo, Egypt.  This is another entity that has nothing to do with PWC, TSC or the United States military.  Further, this certificate is dated March 2004, again eliminating any possibility of Pallares having personal knowledge of the certificate, since she left the employment of Samir Itani and S&S Itani nearly a year earlier.

---

[39] *Id.* at Ex. 2, part 1, p. 33.

[40] *See* Relator Delma Pallares's First Amended Complaint at p. 16, ¶42, n.4, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018, ECF No. 27.

[41] *See id.*

[42] *See id.*

69.     The notion of inappropriate or falsified USDA certificates is further refuted by the fact that since August 2005 the USDA knew of such allegations, investigated them thoroughly, but never claimed there were falsified USDA certificates in either the 2007 Indictment or the 2009 Superseding Criminal Information.  Further, the USDA did not initiate any agency action against Samir Itani or his companies.  To the contrary, after spending more than three years investigating the claims against Samir Itani and his companies, the USDA issued S&S Itani a license under the Perishable Agricultural Commodities Act on May 18, 2009, without any objections.

### (3)     The U.S. Government Admits That No Tainted Food Was Sold

70.     The U.S. Government has admitted that Samir Itani did not sell any tainted food. In ruling on the dispute concerning the amount that Pallares should receive as an award under the False Claims Act, the District Court for the 2005 *Qui Tam* Case paraphrased one of the Department of Justice's ("DOJ") arguments as follows:

> The ***DOJ does object*** to Pallares's contention that she warned of a potential safety issue from the shipment of stale, spoiled, or possibly contaminated food products under forged USDA health certificates ***because there is no evidence that the food at issue caused any injury or illness to United States military personnel***.[43]

Obviously, the food sold by Samir Itani was safe and fit for consumption.  Again Pallares's accusations are shown to have no merit.

71.     Accordingly, it is not surprising that neither the 2007 Indictment nor the Superseding Criminal Information make any reference to the "shelf-life" fraud and tainted food claims made in the 2005 *Qui Tam* Case because none existed.  Indeed, at Samir Itani's sentencing hearing in 2010, the assistant United States' attorney conceded that his office

---

[43] *See* Opinion and Order at p. 24, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018 (S.D. Tex. July 2, 2010), ECF 79 (emphasis added).

determined that it would not be able to prove a criminal charge against Samir Itani related to the alleged "shelf-life fraud."  The assistant United States attorney stated "it was our judgment that we could not make [the shelf-life fraud] case criminally."

> **b.**      **U.S. Government's Conduct Demonstrates That It Did Not Believe the Allegations of the 2005 *Qui Tam* Case.**

72.      As shown above, it is an undisputed fact that the U.S. Government was told by Pallares and her attorneys about the "tainted food" and "shelf-life" claims no later than August 2005, but did absolutely nothing to stop the purchase of food from Samir Itani.  Based on the Plea Agreement, the U.S. Government continued to purchase food that purportedly originated from Samir Itani until September 2006 and stopped buying **only after Samir Itani decided he would not sell food products** to TSC that related to the U.S. Government.

73.      The U.S. Government continued its purchases even though the contracts between the U.S. Government and PWC clearly gave the U.S. Government the right to inspect, reject and return any food that purportedly originated from Samir Itani.[44]

74.      The contracts contain a section entitled "Inspection and Acceptance" which gave the U.S. Government the right to inspect and accept any products that it received from PWC, including those that originated with Samir Itani.[45]  Inspection and acceptance of "FOB Destination Shipments" would be done at the final destination, and all food deliveries would be subject to military veterinary inspection.  Further, an inspection could be expanded if deemed necessary by either the military inspector or the dining facility manager of food service.  The invoice/delivery ticket for the food delivered under the PWC/U.S. Government contracts would

---

[44] Motion to Dismiss Indictment at Ex. 1, part 6, pp. 30-32,  *U.S.A. v. The Public Warehousing Company K.S.C.*, 1:09-cr-00490 (N.D. Ga. Feb. 21, 2012), ECF No. 256-7; Motion to Dismiss Indictment at Ex. 2, part 15, pp. 69-72, *U.S.A. v. The Public Warehousing Company K.S.C.*, 1:09-cr-00490 (N.D. Ga. Feb. 21, 2012), ECF No. 256-26.

[45] *See* Motion to Dismiss Indictment at Ex. 1, part 6, pp. 30-32,  *U.S.A. v. The Public Warehousing Company K.S.C.*, 1:09-cr-00490, ECF No. 256-7; Motion to Dismiss Indictment at Ex. 2, part 15, pp. 69-72,  *U.S.A. v. The Public Warehousing Company K.S.C.*, 1:09-cr-00490, ECF No. 256-26.

not be signed prior to the inspection of each product, unless agreed upon by the customer. Inspection and acceptance of "FOB Origin Shipments" would be done at PWC's CONUS distribution point by a USDA official for whom PWC had to pay the cost.[46]

75. The contracts also provided rejection procedures that gave the U.S. Government the right to reject any product if it "is determined to be defective, damaged, or compromised in any other manner." The U.S. Government could also reject a product if it "is found to be non-conforming or damaged, or *otherwise suspect*."[47] In addition, the contracts required PWC to accept the return of food from the U.S. Government for any of several reasons, including products with concealed or latent damage, *products that do not meet shelf life requirements*, products that do not meet the minimum quality standards, or *"any other condition not specified above that is deemed to be a valid reason for return of product."*[48] Accordingly, the U.S. Government had the contractual ability to stop acquiring food that purportedly originated with Samir Itani. However, there is no evidence of the U.S. Government (after learning in 2005 of the allegations in Pallares's original *qui tam* complaint) ever rejecting or returning a single shipment of food that supposedly originated with Samir Itani. There is also no evidence of even a request from the U.S. Government to PWC asking PWC to discontinue using Samir Itani. Instead, the U.S. Government elected to continue to receive products that supposedly originated with Samir Itani.

---

[46] *See* Motion to Dismiss Indictment at Ex. 1, part 6, pp. 30-32, *U.S.A. v. The Public Warehousing Company K.S.C.*, 1:09-cr-00490, ECF No. 256-7; Motion to Dismiss Indictment at Ex. 2, part 15, pp. 69-72, *U.S.A. v. The Public Warehousing Company K.S.C.*, 1:09-cr-00490, ECF No. 256-26.

[47] *See* Motion to Dismiss Indictment at Ex. 1, part 6, p. 31, *U.S.A. v. The Public Warehousing Company K.S.C.*, 1:09-cr-00490, ECF No. 256-7; Motion to Dismiss Indictment at Ex. 2, part 15, pp. 71-72, *U.S.A. v. The Public Warehousing Company K.S.C.*, 1:09-cr-00490, ECF No. 256-26.

[48] *See* Motion to Dismiss Indictment at Ex. 1, part 6, p. 34, *U.S.A. v. The Public Warehousing Company K.S.C.*, 1:09-cr-00490, ECF No. 256-7; Motion to Dismiss Indictment at Ex. 2, part 1, p. 74, *U.S.A. v. The Public Warehousing Company K.S.C.*, 1:09-cr-00490, ECF No. 256-12.

c.  **The Plea Agreement Provides No Basis to Debar Plaintiffs, Let Alone Supports a 15-Year Debarment.**

76.     Despite the U.S. Government's considerable efforts in investigating the criminal case, it agreed to a plea bargain related only to trucking and invoice charges—nothing related to the alleged "shelf-life" fraud, tainted food claim or any of the other allegations of the 2005 *Qui Tam* Case (including as it was amended).

77.     Indeed, as detailed above, the massive amounts of information the U.S. Government seized in investigating the "shelf-life" fraud and tainted food claims was far greater than any discovery it could get in a civil action.  But despite the mass of information gathered, the U.S. Government did not allege a single claim of shelf-life fraud or tainted food in either the 2007 Indictment or the Superseding Criminal Information.

78.     Moreover, recognizing even the tenuous nature of the overcharging claims asserted in the Superseding Criminal Information, the U.S. Government agreed in the plea bargain that the range of Samir Itani's incarceration, if any, would be only from ***zero*** months to twenty-four months.[49]  This plea agreement is a far-cry from the July 24, 2007, Press Release of the Department of Justice in which the DOJ outlined how Samir Itani could face up to 25 years of imprisonment.

4.  **Pallares's Delay in Pursuing the 2005 *Qui Tam* Case Highlights the Unreliable Nature of Its Allegations.**

79.     Pallares claims that she actively participated in Samir Itani's alleged wrongful conduct beginning in 1999.[50]  Instead of going to the authorities, it appears that Pallares willingly

---

[49] Plea Agreement at p. 7, *United States v. Itani*, No. 4:07-cr-00310 (S.D. Tex. July 21, 2009), ECF 114.

[50] Relator Delma Pallares's First Amended Complaint at ¶25, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018 (S.D. Tex. June 10, 2009), ECF No. 27.

participated in and accepted benefits from Samir Itani's alleged wrongful conduct until she left his employment in June 2003.

80.     Even upon leaving Samir Itani's employment, Pallares did not report Samir Itani's alleged wrongful conduct to the authorities; instead she decided to start a competing export business.[51]

81.     According to Pallares, her fledgling export business failed because Samir Itani "blackballed" her.[52]

82.     It was only after Pallares's export business failed that she decided to embark on the task of pursuing a *qui tam* claim against Samir Itani, the man she blamed for her failure.

83.     Indeed, the U.S. Government itself doubted the reliability of Pallares's allegations because of her long delay in filing the 2005 *Qui Tam* Case.[53] The District Court summarized one of the U.S. Government's arguments as being "[n]ot only is there no evidence that any of the food supplied by [Samir] Itani caused injury or illness among U.S. military personnel, but if Pallares believed that Itani's conduct posed a substantial health and safety risk to the troops, she was under the strictest obligation to report the fraud promptly, but failed to do so."

**5.     The Settlement of the 2005 *Qui Tam* Case Provides No Basis to Debar Plaintiffs.**

84.     Samir Itani and the other defendants to the 2005 *Qui Tam* Case vigorously disputed both liability and amount of the alleged "short shelf-life" and tainted food claims among

---

[51] *See* Opinion and Order at p. 21, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018 (S.D. Tex. July 2, 2010), ECF 79.

[52] *Id.* ("Counsel represented that after Pallares left American Grocers in 2003, she tried to start her own grocery export business, but that Itani had her blackballed so suppliers refused to sell to her.")

[53] *Id.* at 27.

other things.[54]  Specifically, Samir Itani and the other defendants' position from the outset of and throughout the investigation was that no fraud was committed with respect to product dating.[55]

85.     In agreeing to settle, Samir Itani and the other defendants made a business decision to resolve the matter based on the value of the trucking charges and the cost of defense—not the relator's alleged expired and short-shelf life food claims.[56]

86.     In settling the 2005 *Qui Tam* Case (including as amended) all defendants denied liability, including Suzanne Itani, Ziad Itani **and Samir Itani**.  International Exports was not a party to the 2005 *Qui Tam* Case.

87.     The District Court dismissed the 2005 *Qui Tam* Case against the defendants with prejudice on December 2, 2010.

C.     <u>**The Debarment Proceedings and Purported "Findings" by the DLA**</u>

1.     **Overview**

88.     The DLA debarred Samir Itani for alleged wrongful conduct for a period of 15 years.  As for the allegations in the 2005 *Qui Tam* Case, Samir Itani denied any wrongdoing.

89.     The DLA imputed Samir Itani's alleged wrongful conduct to International Grocers, Inc., American Grocers, Inc., American Grocers Ltd. and S&S Itani.  (Ex. 1, p. 11).  As noted above, American Grocers, Inc. and International Grocers, Inc. had ceased to exist as corporate entities before February 2004.

90.     The DLA also debarred Suzanne Itani, Ziad Itani and International Exports because they were "affiliates" of entities identified in the DLA's order, and affiliation purportedly "provides a separate and independent cause" for debarment pursuant to FAR 9.406-

---

[54] *See* Opposed Motion to Correct Sentence Under Federal Rule of Criminal Procedure 35(a) at Ex. A, ¶12, *United States v. Itani*, No. 4:07-cr-00310 (S.D. Tex. Dec. 16, 2010), ECF No. 201-2.

[55] *See Id.* at ¶11.

[56] *See Id.* at ¶12.

2(c). (*See* Ex. 1, p. 12).

91.     In reaching its decision, the DLA failed to follow the well-founded rule that allegations in a complaint cannot be evidence. *American Cancer Soc. v. Cook*, 675 F.3d 524, 529 (5th Cir. 2012) ("A complaint is not evidence of the charges contained in it.") (citations and quotations omitted); *Brown v. Advocate South Suburban Hosp.,* 700 F.3d 1101, 1105 (7th Cir. 2012) ("Mere allegations in a complaint, however, are not 'evidence' and do not establish a triable issue of fact."); *Tate v. District of Columbia*, 627 F.3d 904, 908 (D.C. Cir. 2010) (mere allegations in a complaint are not competent evidence and do not establish a triable fact issue); *Garay v. Liriano,* 943 F. Supp. 2d 1, 20 (D.D.C. 2013) ("Allegations in a complaint are decidedly not evidence….").

### 2.     Suzanne Itani

92.     On July 27, 2007, the DLA suspended Suzanne Itani from government contracting and placed her name on a public list of parties excluded from federal procurement and nonprocurement programs.  The administrative record does not reflect a request from an Assistant Attorney General to extend the period of suspension for an additional six months.

93.     Nevertheless, the DLA continued the suspension of Suzanne Itani from July 27, 2007, up through the date of the DLA memorandum of debarment (September 23, 2011).  During this time period, neither the Department of Justice nor the DLA (nor any other federal agency) initiated legal proceedings against Suzanne Itani.

94.     On March 11, 2011, the DLA notified Suzanne Itani that she was proposed for debarment.  The only ground of which she was given notice was her alleged affiliation with S&S Itani (and **only** S&S Itani) and that the affiliation provided cause for debarment pursuant to FAR 9.406-2(c).  The DLA claimed that Suzanne Itani and S&S Itani are affiliates because (a) either

one controls or has the power to control the other, or (b) a third party controls or has the power to control both.  The DLA concluded, or the FAR required that it conclude, that this purported affiliation provided a "cause of so serious or compelling a nature" to justify debarment pursuant to FAR 9.406-2(c).  Suzanne Itani never received notice, as required by FAR 9.406-4(b), that the DLA would debar her for an additional period of time, and the DLA did not follow the procedures of FAR 9.406-3 and 9.406-4(b) with regard to assessing additional time for debarment, including failing to give the notice required by FAR 9.406-3 and FAR 9.406-4(b).

95.     In the notice of debarment, the Defendants agreed to furnish a copy of the administrative record to Suzanne Itani upon request.  On or about March 24, 2011, counsel for Suzanne Itani formally requested a copy of the administrative record.

96.     The DLA found that Suzanne Itani was an alleged affiliate of S&S Itani, American Grocers, Inc., American Grocers, Ltd., International Grocers, Inc., Itani Land Ltd., Itani Family Management Trust, Itani Ltd. Partnership and International Exports because Suzanne Itani allegedly "controls or has the power to control" these entities.  (Ex. 1, p. 12).

97.     The DLA never provided notice to Suzanne Itani that the DLA was seeking to debar her for any (a) alleged affiliation with American Grocers, Inc., American Grocers, Ltd., International Grocers, Inc., Itani Land Ltd., Itani Family Management Trust, Itani Ltd. Partnership or International Exports, or (b) purported ownership of American Grocers, Ltd. and American Grocers, Inc.

98.     The DLA's decision was legally and factually incorrect, was not based on substantial evidence, and was the result of the DLA not following the procedural requirements of FAR.

99.     48 C.F.R. § 9.403 defines "affiliate" as "Business concerns, organizations, or individuals are affiliates of each other if, directly or indirectly, (1) either one controls or has the power to control the other, or (2) a third party controls or has the power to control both."  The purported affiliation findings by the DLA do not satisfy the requirements of the definition of "Affiliate" provided by 48 C.F.R. § 9.403.  The definition clearly requires that Suzanne Itani had to in fact exercise control or had the "power" to exercise control.  As shown below, the evidence before the DLA indisputably demonstrates that Suzanne Itani never exercised any control and that she did not have the authority or the "power" to exercise control over S&S Itani, or over American Grocers, Inc., American Grocers, Ltd., International Grocers, Inc., Itani Land Ltd., Itani Family Management Trust or Itani Ltd. Partnership.

100.    Further, mere "affiliation" is not sufficient for debarment.  The FAR makes it abundantly clear that debarment requires a showing by the preponderance of the evidence that a cause for debarment under 9.406-2 exists.  There is no evidence of any cause under 9.406-2 or, alternatively, there is insufficient evidence of any cause under 9.406-2.

101.    The 2007 D&B Business Information Report for American Grocers Ltd. and the 2007 D&B Business Information Report for S&S Itani are not "evidence" that support the DLA's position that Suzanne Itani allegedly controlled the various entities that the DLA said were her affiliates.

102.    The first 2007 D&B Business Information Report is only for American Grocers Ltd. and no other entity, and this document lists Suzanne Itani as "Treas-CFO" as "reported 05/30/2007."  The same document clearly identifies Samir Itani as "Pres-CEO" under the sections "Manager" and "Officer(s)."  (*Id.*).  As for directors, the document simply states "The Officer(s)" as "reported 05/30/2007."(*Id.*).

103.    The second 2007 D&B Business Information Report is only for S&S Itani and no other entity, and this document does not even list Suzanne Itani as an officer of S&S Itani.  The document does mention that Suzanne Itani was one of two directors as of "05/14/2007."  However, a single director has no authority, ability or power to control a corporation.  Additionally, the document identifies Samir Itani as president under the sections "Chief Executive" and "The Officer(s)."

104.    As for the reliability of the information contained in 2007 D&B Business Information Reports, one needs only to look at the D&B website's terms of use.  The terms of use provide in pertinent part as follows:

> D&B does **not warrant the accuracy**, completeness, or timeliness **of any of the data** and/or programs (Information) available at this D&B Site. **The Information is provided as is without warranty of any kind, express or implied**, including, but not limited to, implied warranties of merchantability, fitness for a particular purpose, title, or non-infringement.[57]

105.    As for Suzanne Itani's purported ownership of American Grocers, Inc. and American Grocers, Ltd., the only "evidence" in the 2007 D&B Business Information Reports is that (a) Itani Family Limited Partnership had owned American Grocers, Inc. before it converted to American Grocers, Ltd., and (b) Itani Family Management Trust was the general partner of American Grocers, Ltd.  The 2007 D&B Business Information Reports do not identify any of the limited partners.  That said, it is a fact that Suzanne Itani was not a limited partner in (a) American Grocers, Ltd., or (b) the Itani Family Limited Partnership.

106.    As discussed below, the declaration that Suzanne Itani provided to the DLA conclusively establishes that she did not have any significant role at American Grocers or S&S

---

[57] Dun & Bradstreet *Terms of Use*, http://www.dnb.com.ph/files/terms.html (on October 24, 2011, as maintained by the "Wayback Machine," http://web.archive.org/web/20111024222533/http://www.dnb.com.ph/files/terms.html, (last visited Oct. 8, 2014)) (emphasis added).

Itani and that she did not have control over or the power to control American Grocers, Inc., American Grocers, Ltd., S&S Itani, International Grocers, Inc., Itani Land Ltd., Itani Family Management Trust or Itani Ltd. Partnership during the relevant period.

107.    The DLA also makes too much of the guilty plea of Samir Itani as it relates to any control that Suzanne Itani had over S&S Itani and American Grocers, Ltd.  The guilty plea is mere hearsay as it relates to Suzanne Itani.  Further, the guilty plea simply says that "the United States could prove each element of the offense beyond a reasonable doubt."  Whether Suzanne Itani allegedly "owned, controlled and operated" anything is not an element of the offense Samir Itani pleaded guilty to as set forth in the Superseding Criminal Information, to which Suzanne Itani was not a party. Thus, such pleading is superfluous.  More importantly though, the plea agreement only states that "[Samir] Itani, along with his wife, owned, controlled and operated *American Grocers, Inc.*;" no other entity is mentioned.[58]  As previously noted, American Grocers Inc. ceased to exist in 2000.  Consequently, any alleged control or ownership that supposedly existed would have ended in 2000 when American Grocers, Inc. ceased to exist. Thus, the hearsay statement regarding American Grocers, Inc. is also completely irrelevant to a debarment action dealing with purported activity that allegedly occurred between 2004 and 2006.

108.    From the 1990's until approximately 2009 (which includes the timeframe of the conduct alleged in the Superseding Criminal Information and the 2005 *Qui Tam* Case), Suzanne Itani was a full-time stay-at-home mother.  She had minimal to no contact with the customers or suppliers of S&S Itani or American Grocers, Inc., American Grocers, Ltd., International Grocers, Inc., Itani Land, Ltd., Itani Family Management Trust or Itani Ltd. Partnership (collectively the "Samir Entities").  Suzanne Itani also had no involvement with market development of the Samir

---

[58] Plea Agreement at p. 11, *United States v. Itani*, No. 4:07-cr-00310 (S.D. Tex. July 21, 2009), ECF 114. Notably, this statement is in a list of "facts" that "would be offered" in a case against Samir Itani.  *See id.*

Entities.  Further, Suzanne Itani played no role in the operational aspects of the Samir Entities. Suzanne Itani maintained no set work schedule or any regular operational position with the Samir Entities.  Suzanne Itani would only come into the office to sign checks when Samir Itani was on a business trip or occasionally to sign payroll.  Indeed, from the 1990s until Samir Itani resigned from the Samir Entities, the Samir Entities employed an active CPA who served as the controller for the Samir Entities because Suzanne Itani was not involved in them.

109.    Suzanne Itani during the relevant timeframe did not control nor have the power to control S&S Itani or any of the other Samir Entities.  Further, no third party controlled or had the power to control Suzanne Itani and the Samir Entities.

110.    Suzanne Itani was never indicted and there was never any direct or indirect threat of Suzanne Itani being indicted nor was there any pressure placed on Samir Itani by the U.S. Government threatening to prosecute Suzanne Itani as leverage for Samir Itani's plea agreement.

111.    The federal agents' interrogation of the employees of S&S Itani and American Grocers, Ltd. confirmed Suzanne Itani's lack of control of and involvement in the affairs of S&S Itani as well as the other Samir Entities.

112.    During the relevant timeframe, Samir Itani was President/Chief Executive Officer of S&S Itani as well as the other Samir Entities, and only Samir Itani was vested with the executive authority and control over S&S Itani and the other Samir Entities.  Samir Itani was the person who was the "governing authority" (as that phrase is defined by Texas Business Organizations Code §1.002(35)(A)) of S&S Itani and the other Samir Entities.  The "governing authority" is entitled to manage and direct the affairs of an entity under the Texas Business Organizations Code and the governing documents of the entity.

113. A "governing authority" (as defined by Texas Business Organizations Code §1.002(35)(B)) does not include an officer who is acting in the capacity of an officer. Suzanne Itani was not a governing authority (as defined by Texas Business Organizations Code §1.002(35)(A)) of the Samir Entities because she was not entitled to manage and direct the affairs of the Samir Entities. Thus, Suzanne Itani did not have the power or ability to control any of the Samir Entities. Further, Suzanne Itani's focus during the relevant period was being a mother to her three children.

114. Additionally, the Board of Directors of S&S Itani and American Grocers, Inc. could only exercise or authorize the exercise of the powers of the corporation and direct the management of the business and affairs of a corporation if they acted as a group (*i.e.* act as the "board") and not as individual directors. TEX. BUS. ORG. CODE §21.401 (2006). Thus, assuming only for the sake of argument that Suzanne Itani was a director of any of the Samir Entities, she did not have the authority or the power to exercise the powers of such corporations or to direct the management of the business and affairs of the Samir Entities during the relevant time merely because she was a director. *See First Valley Bank of Los Fresnos v. Martin,* 144 S.W.3d 466, 471 (Tex. 2004); *Star Corp. v. General Screw Products Co.,* 501 S.W.2d 374, 380 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ ref'd, n.r.e.).

115. Even the relator, Delma Pallares, claimed that Samir Itani ran the corporate entities to the exclusion of Suzanne Itani such that Suzanne Itani could not exercise any power over the corporate entities. Pallares claims that the corporate defendants in the 2005 *Qui Tam* Case (including S&S Itani, American Grocers, Inc. and American Grocers, Ltd.) (a) "were organized and operated as mere tools and business conduits of [Samir] Itani," (b) "are the alter ego of [Samir] Itani and instrumentalities of [Samir] Itani in conducting his own personal

business activities and functioned solely to achieve the purposes of [Samir] Itani," and (c) "are controlled and used by [Samir] Itani without regard for their separate corporate or business identity."[59]

116.    While the DLA did not find Suzanne Itani's affiliation with Samir provided a cause for her debarment, it did suggest that Suzanne Itani was an affiliate of Samir Itani "by virtue of her position in the companies and her ownership interest in them."  (Ex. 1, p. 6). Suzanne Itani was not an "affiliate," as defined by FAR, of Samir Itani.  Neither person had the right to control the other nor were Samir Itani and Suzanne Itani controlled by a third party. Further, simply being an alleged co-officer or co-owner of a company does not satisfy the requirements for an affiliate under the FAR because control is required and there has been no showing of control of Suzanne Itani by Samir Itani or vice versa or of a third party controlling both.  Also, there is no evidence that shows Suzanne Itani is the owner of any of the Samir Entities.  Additionally, the DLA never provided notice to Suzanne Itani that the DLA was seeking to debar her for any alleged affiliation with Samir Itani.

117.    Suzanne Itani was never a "contractor" as defined in FAR.  Suzanne Itani never directly or indirectly submitted a bid or offer to the U.S. Government, or any agency or department thereof, for a U.S. Government contract.  Further, Suzanne Itani never directly or indirectly subcontracted under a U.S. Government contract.  The record before the DLA does not contain any U.S. Government contract or subcontract to which Suzanne Itani is a party or signed on behalf of a party nor is there any reference in the record that such a contract or subcontract

---

[59] Relator Delma Pallares's First Amended Complaint at ¶¶15-16, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018 (S.D. Tex. June 10, 2009), ECF No. 27.

exists.  Further, there is no evidence that Suzanne Itani caused some other person or entity to enter into a U.S. Government contract or a subcontract relating to a U.S. Government contract.

118.    Moreover, Suzanne Itani never conducted any business with nor was reasonably expected to conduct business with the U.S. Government on behalf of a "contractor" as defined by FAR.  The record before the DLA shows that Suzanne Itani did not interact with the U.S. Government, or any agency or department thereof, nor is there any reference in the record that Suzanne Itani had any contact with the U.S. Government.

119.    The DLA did not find that Suzanne Itani knew or should have known of any of the alleged wrongful conduct at issue in the debarment proceeding.  The DLA did not impute any allegedly wrongful conduct or actions to Suzanne Itani pursuant to FAR 9.406-5.  (*See generally* Ex. 1).

120.    Further, the record before the DLA contains no evidence of any "cause of so serious or compelling a nature that it affects the ***present responsibility*** of" Suzanne Itani (assuming she was a contractor).  *See* FAR 9.406-2(c).  By the time the debarment proceedings were held in 2011, Suzanne Itani had started a new company (International Exports), as explained in paragraph 30, with new management and made the decision to shut-down and terminate S&S Itani, which was terminated in December 2011.  The new management included Erin Betts, a well-qualified CPA and MBA that was hired in 2010 to act as International Exports Chief Operating Officer ("COO") and CFO.  (Mr. Betts resigned from International Exports effective October 31, 2012, after the DLA inexplicably threatened to debar him after praising his hiring.)  Suzanne Itani also instructed the staff of International Exports not to erase any dates from packages.  Suzanne Itani also has had International Exports employ an outside CPA firm and several law firms with whom it coordinates its business practices and to discuss and address

relevant business matters to ensure that the company is in compliance with the laws and regulations affecting its industry.  Additionally, Samir Itani was not and is not an officer, director or employee of the new company.  Therefore, no cause for debarment under FAR 9.406-2(c) exists to justify debarment.  Alternatively, there was insufficient evidence of a cause under FAR 9.406-2(c) to justify any debarment.

121.   As for the "aggravating factors" cited by the DLA, none of the alleged conduct comprising the aggravating factors was the alleged conduct of Suzanne Itani.  Further, the alleged conduct comprising the aggravating factors was not imputed to Suzanne Itani.  Additionally, the alleged aggravating factors that purportedly justified extending the three-year debarment period constituted part of the facts and circumstances upon which the initial debarment action was based.

122.   The alleged conduct and aggravating factors are also not supported by any evidence.  The DLA impermissibly relied upon hearsay that was wholly unreliable and the speculation of persons that had no personal knowledge of the purported events that were alleged in the 2009 amended *qui tam* complaint and presented in a PowerPoint presentation that was included in the administrative record.  The PowerPoint presentation itself is not evidence, but only constitutes the *allegations* made in the 2009 amended *qui tam* complaint and lawyers' arguments about them.  Indeed, the relator's counsel prepared the presentation, not Samir Itani, any of his companies, or even the U.S. government.  Moreover, the purported information in the PowerPoint does not even show any wrongdoing by Samir Itani let alone International Exports, Suzanne Itani or Ziad Itani.  As noted above in Section IV.B.3, the 2009 amended *qui tam* complaint is simply factually incorrect *allegations*, not evidence supporting the DLA's debarment decision.

2.      **International Exports**

123.    On or about June 16, 2011, the DLA notified International Exports that it was proposed for debarment.  The DLA notified International Exports of only one ground for the proposed debarment which was International Exports' alleged affiliation with S&S Itani (and *only* S&S Itani) "because, (a) either one controls or has the power to control the other, or (b) a third party controls or has the power to control both."  The DLA also claimed that the affiliation in and of itself provided a "cause of so serious or compelling a nature" to justify debarment pursuant to FAR 9.406-2(c).  The DLA did not provide notice to International Exports that the DLA was going to claim that International Exports was an affiliate of S&S Itani and American Grocers, Inc. because it was allegedly a continuation of them.  Additionally, the DLA did not provide notice to International Exports that the DLA was going to claim that International Exports was allegedly an affiliate of American Grocers, Inc., American Grocers Limited, International Grocers, Inc., Itani Land Ltd., Itani Family Management Trust and Itani Ltd. Partnership.  Further, International Exports never received notice, as required by FAR 9.406-4(b), that the DLA would debar it for an additional period of time, and the DLA did not follow the procedures of FAR 9.406-3 and 9.406-4(b) with regard to assessing additional time for the debarment, including failing to give the notice required by FAR 9.406-3 and FAR 9.406-4(b).

124.    In the notice of debarment, the Defendants agreed to furnish a copy of the administrative record to International Exports upon request.  On or about June 29, 2011, counsel for International Exports formally requested a copy of the administrative record.

125.    The DLA debarred International Exports, but without identifying in its findings the purported cause for such debarment.  The findings did identify International Exports as an alleged affiliate with S&S Itani, American Grocers, Inc., American Grocers Limited,

International Grocers, Inc., Itani Land Ltd., Itani Family Management Trust and Itani Ltd. Partnership because Suzanne Itani allegedly "controls or can control" these companies. (Ex. 1, p. 12). But this was identified as a cause for debarment of Suzanne Itani, not International Exports. The DLA debarment order suggested that International Exports was allegedly the continuation of American Grocers, Inc. and S&S Itani because, in part, International Exports was allegedly "organized *following the proposed debarment* of AGI and S&S Itani." (Ex. 1, p. 8).

126.    The DLA's decision was legally and factually incorrect, was not based on substantial evidence, and did not follow the procedural requirements of FAR.

127.    International Exports was not an "affiliate," as defined by FAR, of Samir Itani or the Samir Entities. Neither Samir Itani nor the Samir Entities had the right to control International Exports, nor did International Exports have the right to control Samir Itani or the Samir Entities. Further, neither International Exports nor Samir Itani or the Samir Entities were under common control by a third party. As noted above in Section IV.C.2, Suzanne Itani did not control and could not control S&S Itani, American Grocers, Inc., American Grocers Limited, International Grocers, Inc., Itani Land Ltd., Itani Family Management Trust or Itani Ltd. Partnership or any other of the Samir Entities during the relevant timeframe.

128.    Suzanne Itani was not a governing authority (as defined by Texas Business Organizations Code §1.002(35)(A)) of the Samir Entities, including S&S Itani, American Grocers, Inc., American Grocers Limited, International Grocers, Inc., Itani Land Ltd., Itani Family Management Trust or Itani Ltd. Partnership. Because Suzanne Itani was not a governing authority of the Samir Entities, she did not have the power or ability to control these entities. During the relevant timeframe, Samir Itani was President/Chief Executive Officer of S&S Itani as well as the other Samir Entities, and only Samir Itani was vested with the executive authority

and control over S&S Itani and the other Samir Entities.  Samir Itani was the person who was the "governing authority" (as that phrase is defined by Texas Business Organizations Code §1.002(35)(A)) of S&S Itani and the other Samir Entities.

129.    Further, Suzanne Itani has never been a "contractor" as defined in FAR as explained above.

130.    Samir Itani has never been a director, officer, manager or employee of International Exports.  Additionally, Samir Itani was incarcerated in the federal prison system from January 2011 through at least July 31, 2012—further confirming that Samir Itani was not part of any management team or a principal in International Exports.

131.    International Exports was formed on or about March 16, 2010 such that it did not exist during the relevant timeframe of the purported conspiracies alleged in the Superseding Criminal Information and the 2009 amended complaint in the 2005 *Qui Tam* Case.

132.    Contrary to the DLA findings, International Exports was not organized following the proposed debarment of American Grocers, Ltd. and S&S Itani.  The DLA sent its letters of proposed debarment to both American Grocers, Ltd. and S&S Itani on March 11, 2011, nearly a year after International Exports was formed and after Suzanne Itani began to wind down American Grocers, Ltd and S&S Itani.  Additionally, at no time was either American Grocers, Ltd. or S&S Itani indicted by the U.S. Government.

133.    International Exports had and has a completely different management team and principal employees from S&S Itani and the other Samir Entities.  Further the owner of International Exports is the Itani Family Limited Partnership in which Samir Itani is neither a general or limited partner.

134.   As noted above, shortly after its formation, International Exports employed Erin Betts, a well-qualified CPA with an MBA degree, to serve as its COO and CFO.  The role of the new COO/CFO included providing International Exports with independent management guidance and processes and to ensure that the company's books and practices were and are properly carried out, periodically reviewed and improved as needed.

135.   The DLA's 2011 debarment memorandum praised International Exports for hiring Mr. Betts.  (Ex. 1, p. 10 (noting as a mitigating factor that "International Exports has hired a CPA to serve as [COO] and [CFO]…").  Despite praising the hiring of Mr. Betts in 2011, in 2012 the DLA sought to debar Mr. Betts as an affiliate of International Exports, Suzanne Itani and Itani Family Limited Partnership.  The DLA dropped the debarment proceeding only after Mr. Betts agreed to resign his position and disassociate himself from International Exports in order to avoid the stigma of debarment.  International Exports is still trying to hire a replacement for Mr. Betts that is similarly qualified.

136.   Suzanne Itani is and has been International Exports' CEO, a position she only briefly held with S&S Itani after Samir's indictment and long after the alleged wrongful conduct terminated.

137.   International Exports also employed and employs an outside CPA firm and several law firms with whom it coordinates its business practices and to discuss and address relevant business matters to ensure that the company is in compliance with the laws and regulations affecting its industry.

138.   Further, even assuming (incorrectly) an "affiliation" existed between S&S Itani and International Exports, mere affiliation is not sufficient for the debarment of International Exports.  The FAR makes it abundantly clear that debarment requires a showing by the

preponderance of the evidence that a cause for debarment under 9.406-2 exists.  Here, the DLA found no cause for debarment of International Exports under 9.406-2(c), and only cited the alleged affiliation between International Exports, Suzanne Itani and other entities as a cause for debarment of Suzanne Itani.  In all events, innocent affiliation between International Exports and Suzanne Itani does not constitute a cause of "so serious or compelling a nature" to justify debarment.  Simply put, there is no evidence of a cause under 9.406-2(c) or alternatively, there is insufficient evidence of any such cause.

139.    International Exports has never been a "contractor" as defined in FAR. International Exports never directly or indirectly submitted a bid or offer to the U.S. Government, or any agency or department thereof, for a U.S. Government contract.  Further, International Exports never directly or indirectly subcontracted under a U.S. Government contract.  The record before the DLA does not contain any U.S. Government contract or subcontract to which International Exports is a party or signed on behalf of a party nor is there any reference in the record that such a contract or subcontract exists.  Further, there is no evidence that International Exports caused some other person or entity to enter into a U.S. Government contract or a subcontract relating to a U.S. Government contract.

140.    Moreover, International Exports never conducted any business with nor was reasonably expected to conduct business with the U.S. Government on behalf of a "contractor" as defined by FAR.  The record before the DLA shows that International Export did not contract with the U.S. Government, or any agency or department thereof, nor is there any reference in the record that International Exports had any contract with the U.S. Government.

141.    The DLA did not find that International Exports knew or should have known of any of the alleged wrongful conduct at issue in the debarment proceeding.  The DLA did not

impute any allegedly wrongful conduct or actions to International Exports pursuant to FAR 9.406-5.  Therefore, no cause for debarment under FAR 9.406-2 exists to justify debarment.  Alternatively, there was insufficient evidence of a cause under 9.406-2.

142.    As for the "aggravating factors" cited by the DLA, none of the alleged conduct comprising the aggravating factors was the alleged conduct of International Exports.  Further, the alleged conduct comprising the aggravating factors was not imputed to International Exports.  Additionally, the alleged aggravating factors that purportedly justified extending the three-year debarment period constituted part of the facts and circumstances upon which the initial debarment action was based.  Accordingly, even if the alleged aggravating factors had somehow been attributed to International Exports (and they were not), they could not be utilized to extend the debarment.  *See* 48 C.F.R. § 9.406-4(b) ("[A] debarment may not be extended solely on the basis of the facts and circumstances upon which the initial debarment action was based.").

143.    The alleged conduct and aggravating factors are not supported by any evidence.  The DLA impermissibly relied upon hearsay that was wholly unreliable and the speculation of persons that had absolutely no personal knowledge of the purported events that were alleged in the 2009 amended *qui tam* complaint and presented in a PowerPoint presentation that was included in the administrative record.  The PowerPoint presentation simply parroted the arguments and the allegations made by the 2009 amended *qui tam* complaint.  Indeed, the relator's counsel prepared the presentation, not Samir Itani, any of his companies, any of the Plaintiffs, or even the U.S. government.  Moreover, the purported information in the PowerPoint does not even show any wrongdoing by Samir Itani let alone International Exports, Suzanne Itani or Ziad Itani.  As noted above in Section IV.B.3, the 2009 amended *qui tam* complaint is simply factually incorrect *allegations*, not evidence supporting the DLA's debarment decision.

### 3.   Ziad Itani

144.   The DLA never suspended Ziad Itani from contracting with the U.S. Government. However, on or about June 3, 2011 the DLA did notify Ziad Itani that he was proposed for debarment on two grounds.  First, the DLA alleged that Ziad Itani was an affiliate of S&S Itani "because, (a) either one controls or has the power to control the other, or (b) a third party controls or has the power to control both" and that the affiliation provided cause for debarment pursuant to FAR 9.406-2(c).  Second, the DLA proposed to impute the conduct of S&S Itani to Ziad Itani pursuant to FAR 9.406-5(b) and that the imputation of the conduct would provide a cause for debarment pursuant to FAR 9.406-2(c).  Ziad Itani never received notice, as required by FAR 9.406-4(b), that the DLA would debar him for an additional period of time, and the DLA did not follow the procedures of FAR 9.406-3 and 9.406-4(b) with regard to assessing additional time for debarment, including failing to give the notice required by FAR 9.406-3 and FAR 9.406-4(b).

145.   In the notice of debarment, the Defendants agreed to furnish a copy of the administrative record to Ziad Itani upon request.  On or about June 29, 2011, counsel for Ziad Itani formally requested a copy of the administrative record.

146.   The DLA only debarred Ziad Itani based on an alleged affiliation with S&S Itani. The DLA found that Ziad Itani was an alleged affiliate of S&S Itani because Ziad allegedly "controls or can control [S&S Itani]." (Ex. 1, p. 12).  Though it did not find as much, the DLA also suggested that Ziad Itani was an affiliate of S&S Itani because he "was and is an employee and family member in these family-run businesses…."  (Ex. 1, p. 7).

147.     The DLA's debarment decision is both legally and factually incorrect, not based on substantial evidence, and resulted from the DLA not following the procedural requirements of FAR.

148.     The purported affiliation findings do not satisfy the requirements of the definition of "Affiliate" provided by 48 C.F.R. § 9.403.  The definition clearly requires that Ziad Itani had to in fact exercise control or had the "power" to exercise control.  As shown below, the only evidence before the DLA was that Ziad never exercised any control and that he did not have the authority or the "power" to exercise control.

149.     Further, mere "affiliation" is not sufficient for debarment.  The FAR makes it abundantly clear that debarment requires a showing by the preponderance of the evidence that a cause for debarment under 9.406-2 exists.  There is no evidence of any cause under 9.406-2.

150.     The only evidence before the DLA was that Ziad Itani did not control and did not have the authority or power to control S&S Itani (or any of the other Samir Entities).  Samir Itani never involved Ziad Itani in executive decisions related to S&S Itani or any of the other Samir Entities or in managing or running any of these businesses in any way.  Ziad Itani was never an officer or director of S&S Itani or any of the other Samir Entities.  Further, Ziad Itani was not an owner or principal of S&S Itani or any of the other Samir Entities.

151.     The 2007 D&B Business Information Report for S&S Itani used by the DLA shows that S&S Itani was owned by the "Itani Family Partnership" and the "Itani Family Management Trust".   Instead, Ziad Itani was an employee, and his work was based on instructions he received from the respective company's management and staff.  Further, Ziad Itani is not even mentioned in either the 2007 D&B Business Information Report for S&S Itani

or the 2007 D&B Business Information Report for American Grocers, Ltd.   The DLA's administrative record contained no evidence to the contrary.

152.   During the relevant timeframe, Samir Itani was President/Chief Executive Officer of S&S Itani as well as the other Samir Entities, and only Samir Itani was vested with the executive authority and control over S&S Itani and the other Samir Entities.   Samir Itani was the person who was the "governing authority" (as that phrase is defined by Texas Business Organizations Code §1.002(35)(A)) of S&S Itani and the other Samir Entities.

153.   Further, even the relator, Delma Pallares, claimed that Samir Itani solely ran the corporate entities to the exclusion of everyone, even Ziad Itani, such that Ziad could not exercise any power over the corporate entities.[60]

154.   Ziad Itani's job required him to process millions of cases of product each year for Samir Itani's companies and these cases would hold as much as 10 to 30 individual packages of products.   Ziad Itani declared that he (a) coordinated the persons who handled the delivery and unloading of products at the facilities used by Samir Itani's companies, (b) insured that the product was inventoried and organized, (c) processed products according to the orders and requirements of Samir Itani's customers, (d) confirmed that the product containers and cartons were marked, (e) made sure the product cartons were properly packed on crates for shipping, and (f) insured that completed orders were moved out of the facilities onto trucks for shipping to their destination.   The DLA's administrative record contained no evidence to the contrary.

155.   Further, Ziad Itani had no role or responsibilities for the aspects of S&S Itani's operations—assessing charges for trucking, invoicing of suppliers or making payments to

---

[60] *See* Relator Delma Pallares's First Amended Complaint at ¶¶15-16, *United States ex rel. Pallares v. Itani*, No. 4:05-cv-03018, ECF No. 27.

customers—for which Samir Itani pleaded guilty.  Ziad Itani had no idea that anything allegedly wrong was occurring.  The DLA's administrative record contained no evidence to the contrary.

156.    Ziad Itani also testified via declaration that he had no knowledge and was unaware of any instances of improper dates being placed on a product to allegedly hide the fact the product was stale or out of date.  Ziad Itani further testified that, as long as he worked for S&S Itani, the business would regularly return products to suppliers when the products had short shelf-lives.  The DLA's administrative record contained no evidence to the contrary.

157.    Accordingly, substantial evidence does not support the DLA's finding that Ziad Itani was an "affiliate" of S&S Itani.

158.    The evidence also conclusively establishes that Ziad Itani was not a "contractor" as defined by FAR.  Ziad never directly or indirectly submitted a bid or offer to the U.S. government, or any agency or department thereof, for a U.S. Government contract.  Further, Ziad never directly or indirectly subcontracted under a U.S. Government contract.  The record before the DLA does not contain any U.S. Government contract or subcontract to which Ziad Itani is a party or signed on behalf of a party nor is there any reference in the record that such a contract or subcontract exists.  Further, there is no evidence that Ziad Itani caused some other person or entity to enter into a U.S. Government contract or a subcontract relating to a U.S Government contract.

159.    Additionally, Ziad Itani never conducted any business with nor was reasonably expected to conduct business with the U.S. Government on behalf of a "contractor" as defined by FAR.  The record before the DLA shows that Ziad Itani did not interact with the U.S. Government, or any agency or department thereof, nor is there any reference in the record that Ziad had any contact with the U.S. Government.

160.   The DLA did not impute any allegedly wrongful conduct to Ziad Itani pursuant to FAR 9.406-5.  Thus, the DLA did not find that Ziad Itani knew or should have known of any of the alleged wrongful conduct at issue in the debarment proceeding.

161.   Even if substantial evidence supported the DLA's finding that Ziad Itani was an unknowing "affiliate" of S&S Itani (and it does not), no cause for debarment under FAR 9.406-2 exists to justify debarment.  Alternatively, there was insufficient evidence of a cause under FAR 9.406-2.  More particularly, an innocent, unknowing affiliation or familial relation is not a "serious" and "compelling" cause, *see* 48 C.F.R. § 9.406-2(c), justifying debarment.

162.   As for the "aggravating factors" cited by the DLA, none of the alleged conduct comprising the aggravating factors was the alleged conduct of Ziad Itani.  Further, the alleged conduct comprising the aggravating factors was not imputed to Ziad Itani.  Additionally, the alleged aggravating factors that purportedly justified extending the three-year debarment period constituted part of the facts and circumstances upon which the initial debarment action was based.

163.   The alleged conduct and aggravating factors are not supported by substantial evidence.  The DLA impermissibly relied upon hearsay that was wholly unreliable and the speculation of persons that had no personal knowledge of the purported events that were alleged in the 2009 amended *qui tam* complaint and presented in a PowerPoint presentation that was included in the administrative record.  The PowerPoint presentation is simply the restatement of and arguments about allegations made in the 2009 amended *qui tam* complaint.  Indeed, the relator's counsel prepared the presentation, not Samir Itani, any of his entities, any of the Plaintiffs, or even the U.S. Government.  Moreover, the purported information in the PowerPoint does not even show any wrongdoing by Samir Itani let alone International Exports, Suzanne Itani

or Ziad Itani.  As noted above in Section IV.B.3, the 2009 amended *qui tam* complaint is simply factually incorrect *allegations*, not evidence supporting the DLA's debarment decision.

### F.   <u>Harm Caused by the Debarment</u>

164.   The debarments of International Exports, Suzanne Itani and Ziad Itani negatively impact their livelihoods and business.

165.   The debarments of Suzanne Itani, International Exports and Ziad Itani stigmatize them.  On a governmental website, which is available to the general public, the U.S. Government states that Suzanne Itani, International Exports and Ziad Itani, respectively have been:

> [d]etermined ineligible upon completion of administrative proceedings establishing by preponderance of the evidence of a cause of a serious and compelling nature that it affects present responsibility; or determined ineligible based on other regulation, statute, executive order or other legal authority.[61]

Despite having done nothing wrong nor having known (actually or constructively) of any wrongdoing, the U.S. government publicly represents that these individuals and entity are ineligible after having been determined to lack present responsibility by a "cause of so serious and compelling [a] nature."[62]

166.   Suzanne Itani's and International Exports' debarments inhibit International Exports ability to retain and attract employees.  As explained in paragraph 135, after initially praising his hiring in 2011, in 2012 the DLA proposed to debar one of International Exports' officers, Mr. Betts, based on his affiliation with International Exports, Suzanne Itani and the Itani Family Limited Partnership (another entity debarred solely for alleged affiliations).  Mr. Betts

---

[61] *See* System for Award Management, Exclusion Summary, https://www.sam.gov/.  At <u>https://www.sam.gov</u> click "search records" and enter "Suzanne Itani" to see the exclusion summary for Suzanne Itani, enter "Ziad Itani" to see the exclusion summary for Ziad Itani, and enter "International Exports" to see the exclusion summary for International Exports.

[62] *See id.*

resigned from International Exports to avoid the stigma of debarment.  In exchange for Mr. Betts resigning from International Exports, the DLA terminated the proposed debarment.  Since his departure, International Exports has been unable to hire a similarly qualified replacement for Mr. Betts because of the stigma of debarment.

167.    Suzanne Itani's and International Exports' debarments damage International Exports business by inhibiting its ability to obtain licenses and U.S. Government credit/reimbursement for activities like trade shows.

168.    As a part of its export business, International Exports requested a "PACA" license from the USDA.

169.    In response, the USDA initiated a legal proceeding compelling International Exports to "show cause" why its license application should not be denied.

170.    In support of a licensure denial, the USDA cited Suzanne Itani's and International Exports' debarments as reasons why the USDA believed that International Exports should not be licensed.  *Id.*

171.    This action forced International Exports to hire lawyers and initiate an appeal.

172.    Ziad Itani's debarment stigmatizes him.  The debarment would make it difficult to find employment by another company, particularly a company that is a contractor or subcontractor for a contract with the U.S. Government.

**V.**

**COUNT ONE**

**DEFENDANTS' ACTIONS ARE ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, NOT SUPPORTED BY SUBSTANTIAL EVIDENCE, AND OTHERWISE NOT IN ACCORDANCE WITH LAW AND VIOLATE DUE PROCESS OF LAW AS PROVIDED BY FEDERAL LAW AND THE UNITED STATES CONSTITUTION.**

173.   The foregoing allegations (paragraphs 1 through 172) are incorporated herein and in each subpart below as if fully restated.

**A.      Principles of statutory construction preclude an application of "affiliate debarment" to Suzanne Itani and Ziad Itani.**

174.   Debarring Suzanne Itani as an affiliate because of her mere alleged status as a corporate officer and/or owner is arbitrary and capricious.  Likewise, debarring Ziad Itani as an affiliate when he was only a mere employee is arbitrary and capricious.

175.   Specifically, to permit debarment of a person in the absence of the person's participation in—or actual or constructive knowledge of—the wrongful conduct unnecessarily renders 48 C.F.R. §9.406-5 superfluous.  *See TRW Inc. v. Andr*ews, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.").

176.   48 C.F.R. § 9.406-5(b) provides as follows: "The fraudulent, criminal, or other seriously improper conduct of a contractor may be imputed to any officer, director, shareholder, partner, employee, or other individual associated with the contractor *who participated in, knew of, or had reason to know of the contractor's conduct*."  (Emphasis added)

177.   Participation in, knowledge of, or constructive knowledge of improper conduct is the only basis on which to debar an individual employee, officer or shareholder.  *See Novicki v. Cook*, 946 F.2d 938, 940 (D.C. Cir. 1991) ("[A]n individual employee or officer can only be

debarred if he or she participated in, knew of, or had reason to know of the contractor's conduct."); *see also Alf v. Donley*, 666 F. Supp. 2d 60, 68 (D.D.C. 2009) (noting that knowledge cannot be imputed to an officer unless specific evidence exists to prove that the officer participated in or knew of the misconduct) *vacated pursuant to settlement and stipulation of parties*, Civil Action No. 1:09-cv-00802-RMU.

178.    There is no evidence, let alone substantial evidence, that would indicate that either Suzanne Itani or Ziad Itani "participated in, knew of, or had reason to know of the contractor's conduct."  Indeed, the Defendants did not make any such findings.

179.    Further, the Defendants did not impute any conduct to Suzanne Itani and Ziad Itani.

180.    Despite their innocence, the Defendants debarred Suzanne Itani based merely on her status as an alleged corporate officer and/or owner and Ziad Itani based merely on his alleged status as an employee and a relative of Samir Itani.  (*See* Ex. 1, p. 7, 12).[63]

181.    48 C.F.R. § 9.406-5(b) prohibits the DLA from debarring an officer, director, shareholder, partner or employee of a contractor merely because of the fact that the person is an officer, director, shareholder, partner or employee.

182.    The DLA cannot debar an officer, director, shareholder, partner or employee as an "affiliate" solely on the basis of their position because such an interpretation unnecessarily renders 48 C.F.R. § 9.406-5(b) superfluous.

183.    Thus, there is no evidence or, alternatively, a lack of substantial evidence of any basis justifying the debarment of Suzanne Itani and Ziad Itani.

---

[63] The DLA's interpretation of the Federal Acquisition Regulations is not entitled to substantial deference because (1) the Federal Acquisition Regulations were written by numerous agencies and (2) construction of a regulation by a DLA debarring official, as opposed to the head of an agency, is not given dispositive weight.  *Caiola v. Carroll*, 851 F.2d 395, 399 (D.C. Cir. 1988).

184.     Therefore, the debarments of Suzanne Itani and Ziad Itani should be overturned.

**B.     Mere affiliation is an insufficient cause to support the debarment of Suzanne Itani and Ziad Itani under 48 C.F.R. § 9.406-2.**

185.     48 C.F.R. § 9.402(b) specifically provides that an agency may debar someone "only for the causes and in accordance with the procedures set forth in" subpart 9.4.

186.     The only cause purportedly found by the Defendants allegedly justifying the debarment of Suzanne Itani and Ziad Itani was under FAR 9.406-2(c) for Suzanne Itani's and Ziad Itani's purported mere association with certain people/entities.

187.     FAR 9.406-2(c) is a catchall provision that permits debarment when the cause is "of so serious or compelling a nature."

188.     However, mere association and affiliation is not a cause of a serious or compelling nature.   Further, the mere act of association and affiliation upon which the Defendants rely is not remotely similar to and does not fit the context of the provisions listing specific causes for debarment under FAR 9.406-2.

189.     Moreover, even assuming that someone other than the CEO had the power to control an entity under Texas law (which they do not), such alleged power is meaningless when the person (like Suzanne Itani and Ziad Itani) has no actual or constructive knowledge of the alleged wrongdoing giving rise to the debarment such that the person could correct the situation. A debarment under these circumstances does not satisfy the purpose, let alone the legal requirements, of debarment and makes the debarment nothing but a punitive measure targeting the innocent.

190.     Accordingly, the debarments of Suzanne Itani and Ziad Itani should be overturned because there is no evidence or, alternatively, insufficient evidence that any cause under FAR 9.406-2 existed for their debarment.

**C.**     **Assuming "mere affiliation" was a sufficient cause for debarment, there is no evidence or, alternatively, insufficient evidence that Suzanne Itani met the definition of affiliate.**

1.     **The Defendants are limited to debarring Suzanne Itani as an affiliate of only S&S Itani because the Defendants did not provide notice that she could be debarred as the affiliate of any other entity.**

191.     Suzanne Itani can only be debarred as an affiliate of S&S Itani, Inc., (and no other entity or person) because that is the only basis of debarment upon which the Defendants put Suzanne Itani on notice.  *See* 48 C.F.R. § 9.406-3(c) ("A notice of proposed debarment *shall* be issued by the debarring official advising the contractor and any specifically named affiliates…(2) Of the reasons for the proposed debarment in terms sufficient to put the contractor on notice of the conduct or transaction(s) upon which it is based.").

192.     Even though the Defendants did not provide Suzanne Itani notice, the Defendants found "S&S Itani dba American Grocers, [American Grocers, Inc., American Grocers, Ltd., International Grocers Inc.], Itani Land Ltd, Itani Family Management Trust, Itani Ltd. Partnership, International Export[ sic] Inc., and Suzanne Itani are affiliates, because, directly or indirectly, Suzanne Itani controls or can control these companies."  (Ex. 1, p. 12).

193.     No evidence or, alternatively, insufficient evidence supports the alleged finding that Suzanne Itani was an affiliate of (a) S&S Itani, Inc., or (b) the other entities for which the Defendants failed to provide notice to Suzanne Itani.  As established in Section IV, Suzanne Itani did not control and did not have the power to control these entities and no third party controlled Suzanne Itani and these entities.

194.     Therefore, the debarment of Suzanne Itani should be overturned because there is no evidence or, alternatively, insufficient evidence that Suzanne Itani was an affiliate of any of these entities.

**2.      The finding that Suzanne Itani was an affiliate of S&S Itani is arbitrary and capricious and not supported by substantial evidence.**

195.    The Defendants based their debarment of Suzanne Itani on her purported officer status in and ownership of S&S Itani.  (Ex. 1, pp. 3-6).

196.    Substantial evidence does not support a finding that Suzanne Itani's officer status at S&S Itani provided her with authority or ability to control S&S Itani.  Indeed, Section IV establishes that Suzanne Itani had no authority and in fact did not control S&S Itani and that no third party controlled both Suzanne Itani and S&S Itani.

197.    The only evidence in the record is hearsay, and it merely indicates that Suzanne Itani was listed as the CFO at S&S Itani in 2007.

198.    As detailed in the Section IV, the record conclusively shows that Suzanne Itani was not an acting officer involved in day to day activities.  The company hired an accountant that took over Suzanne Itani's role in S&S Itani before the alleged wrongdoing occurred.  In other words, Suzanne Itani was, at most, an inactive officer.

199.    Specifically, the evidence in the record is uncontroverted that Suzanne Itani was at home raising children when the alleged wrongful conduct occurred.  She maintained no set work schedule or any regular operational position within S&S Itani long before the alleged conduct occurred.  Further, Texas law provides that an officer does not have control of the affairs of a corporation.

200.    Samir Itani was the CEO of S&S Itani and controlled it to the exclusion of everyone.  In fact, Samir Itani kept Suzanne Itani out of the loop as to both small and big matters relating to S&S Itani.

201.    Further, there is no evidence that supports a finding that Suzanne Itani owned S&S Itani.

202.   In fact, the Defendants conceded that Suzanne Itani did not own S&S Itani.  (Ex. 1, p. 3) ("Together, Itani Family Management Trust (98%) and Itani Ltd. Partnership (2%) own 100 percent of the capital stock of S&S Itani, Inc.").

203.   Therefore, the debarment of Suzanne Itani based on her alleged affiliation with S&S Itani should be overturned because there is no evidence or, alternatively, insufficient evidence of the alleged affiliation.

> **3.   The Defendants' finding that Suzanne Itani is an affiliate with International Grocers, American Grocers, Inc. and American Grocers, Ltd. is arbitrary and capricious and not supported by substantial evidence and does not support debarment.**

> > a.   **International Grocers, American Grocers, Inc. and American Grocers, Ltd. are not "contractors."**

204.   Even under the DLA's erroneous interpretation of 48 C.F.R. § 9.406-1(b), debarment can only be extended to an affiliate of the "contractor."  "The debarring official may extend the debarment decision *to include any affiliates of the **contractor*** if they are (1) specifically named and (2) given written notice of the proposed debarment and an opportunity to respond."  48 C.F.R. § 9.406-1(b) (emphasis added).  A contractor is an individual or entity that (1) "Directly or indirectly … submits offers for or is awarded, or reasonably may be expected to submit offers for or be awarded, a Government contract…; (2) Conducts business, or reasonably may be expected to conduct business, with the Government…."

205.   The administrative record contains no evidence, much less substantial evidence, that International Grocers, American Grocers, Inc. or American Grocers, Ltd. are "contractors."

206.   The administrative record contains no evidence that International Grocers or American Grocers, Inc. directly or indirectly submitted an offer for, was awarded, or reasonably could be expected to submit an offer or to be awarded a government contract.

207.    The administrative record contains no evidence that either International Grocers or American Grocers, Inc. conducts business, or reasonably may be expected to conduct business, with the government after 2000.

208.    Indeed, International Grocers and American Grocers, Inc. ceased to exist before (a) the alleged occurrence of the conduct from which these debarments stemmed, (b) the commencement of the Defendants' debarment proceedings, and (c) the issuance of the Defendants' debarment decision.

209.    The administrative record also lacks any evidence that American Grocers, Ltd. directly or indirectly submitted an offer for, was awarded, or reasonably could be expected to submit an offer or be awarded a government contract.

210.    The administrative record contains no evidence that American Grocers, Ltd. conducts business, or reasonably may be expected to conduct business, with the government.

211.    To the contrary, the evidence in the record is undisputed that American Grocers, Ltd. was an employment leasing agency, and the record is devoid of evidence that American Grocers leased, or sought to lease, employees to the U.S. government.

212.    Because International Grocers, American Grocers, Inc. and American Grocers, Ltd. are not "contractors," if Suzanne Itani was an affiliate of these entities, which she is not, it would be irrelevant.  The Defendants only have authority to debar the affiliate of a contractor (assuming the requirements for debarment are satisfied), not the affiliate of an affiliate of a contractor.  Consequently, the debarment of Suzanne Itani based on her alleged affiliation with these entities should be overturned.

        **b.**      **The alleged affiliation of Suzanne Itani with International Grocers, Inc. and American Grocers, Inc. is an insufficient ground for debarment because the entities ceased to exist well before the alleged wrongful conduct upon which the debarments are based.**

213.    As established in Section IV, there is no evidence, much less substantial evidence, that either International Grocers, Inc. or American Grocers, Inc. existed during or after the alleged wrongful conduct at issue in the debarment proceeding.

214.    To the contrary, International Grocers, Inc. and American Grocers, Inc. ceased to exist years before the alleged wrongful conduct occurred.

215.    International Grocers, Inc. changed its name to American Grocers, Inc. in November 1999.

216.    American Grocers, Inc. converted to American Grocers, Ltd. in 2000.

217.    The alleged wrongful conduct did not purportedly commence until 2004.

218.    The past ability to control an entity that (1) is no longer in existence and (2) ceased to exist before any allegations of wrongful conduct is not a proper basis on which to debar an affiliate.

219.    Further, the plain language of the regulation compels that one cannot be punished for a past association with an entity.  48 C.F.R. § 9.403 (explaining that one is an affiliate when one "controls" or "can control" another as opposed to being an affiliate when one controlled or could control another.)

220.    Thus, Suzanne Itani's purported officer or ownership status related to International Grocers, Inc. or American Grocers, Inc. is irrelevant to the debarment action. Therefore, the debarment of Suzanne Itani based on her affiliation with these entities should be overturned.

c.    **The Defendants' finding that Suzanne Itani owned or controlled International Grocers, American Grocers, Inc. and American Grocers, Ltd. is arbitrary and capricious and not supported by substantial evidence.**

221.    As established in Section IV, the record is devoid of evidence demonstrating that Suzanne Itani controlled International Grocers, American Grocers, Inc. and American Grocers, Ltd.

222.    Because International Grocers and American Grocers, Inc. ceased to exist as entities in 1999 and 2000, respectively, whether Suzanne Itani was an officer or director of these corporations is immaterial to the issue of affiliation and debarment because any position of an officer or director would terminate upon these entities ceasing to exist.

223.    As for American Grocers, Ltd., the only purported evidence in the record is hearsay and the hearsay information only indicates that Suzanne Itani was merely listed as the CFO as of May 30, 2007.  Further, American Grocers, Ltd. was only in the employee leasing business and not involved in any export operations.

224.    As detailed in the Section IV, the record conclusively shows that Suzanne Itani was only a nominal officer uninvolved in day to day activities.  The company hired an accountant to take over Suzanne Itani's role in the business before the alleged wrongdoing occurred.  In other words, Suzanne Itani was an officer in title only.

225.    Samir Itani was the CEO of American Grocers, Ltd. and controlled it to the exclusion of everyone.  In fact, Samir Itani kept Suzanne Itani out of the loop as to both small and big matters relating to American Grocers, Ltd.

226.    As detailed above in Section IV, the evidence in the record is uncontroverted that Suzanne Itani was at home raising children when the alleged wrongful conduct occurred.  She maintained no set work schedule or any regular operational position within American Grocers,

Ltd. long before the alleged conduct occurred.  Further, Texas law provides that an officer does not have control of the affairs of a corporation.

227.    Additionally, there is no evidence in the record or, alternatively, insufficient evidence that Suzanne Itani owned International Grocers, American Grocers, Inc. and American Grocers, Ltd.

228.    The evidence in the record shows that Itani Family Limited Partnership was the owner of American Grocers, Inc. before it converted to American Grocers, Ltd. and that the Itani Family Limited Partnership owned American Grocers, Ltd. after the conversion. ("Itani Family Limited Partnership owned the shares of former American Grocers, Inc., and owns the share interests of the dormant American Grocers, Ltd.").

229.    Thus, the debarment of Suzanne Itani based on affiliation with these entities should be overturned because there is no evidence or, alternatively, insufficient evidence that she allegedly controlled these entities or that a third party controlled both Suzanne Itani and these entities.

       **4.**      **The Defendants' finding that Suzanne Itani controlled or could control Itani Land, Itani Family Limited Partnership and Itani Family Management Trust is arbitrary and capricious and not based on substantial evidence in the record.**

230.    Without explaining its decision, the Defendants summarily concluded that Suzanne Itani controlled or could control Itani Land, Itani Family Limited Partnership, and Itani Family Management Trust.  (Ex.1, pp. 7, 12).  However, as explained in Section IV, no such control existed.

231.    Because the Defendants have not articulated its basis for debarment, this reason alone renders the finding arbitrary and capricious. *Stainback v. Marbus*, 671 F. Supp. 2d 126,

136 (D.D.C. 2009) ("[A] conclusion without an articulated basis for it is the essence of arbitrariness.").

232.    Further, this conclusory statement is irrelevant to Suzanne Itani's debarment.

233.    A debarring official may only debar affiliates if they are "*affiliates of the contractor*" providing the affiliates are (1) specifically named and (2) given written notice of the proposed debarment and an opportunity to respond.  48 C.F.R. § 9.406-1(b) (emphasis added).

234.    The administrative record contains no evidence, much less substantial evidence, that Itani Land, Itani Family Limited Partnership, Itani Family Trust and Suzanne Itani are "contractors."

235.    The administrative record contains no evidence that Itani Land, Itani Family Limited Partnership, Itani Family Trust or Suzanne Itani directly or indirectly submitted an offer for, was awarded or reasonably could be expected to submit an offer or to be awarded a government contract.

236.    The administrative record contains no evidence that either Itani Land, Itani Family Limited Partnership, Itani Family Trust or Suzanne Itani conducts business, or reasonably may be expected to conduct business with the U.S. Government.

237.    To the extent Suzanne Itani is an affiliate with any of these entities (which she is not), she is the "affiliate" of an "affiliate," not the contractor.  Such a finding would not be a legally sufficient reason to debar Suzanne Itani.

238.    Therefore, the debarment of Suzanne Itani based on affiliation with these entities should be overturned because there is no evidence or, alternatively, insufficient evidence that Suzanne Itani controlled these entities or that a third party controlled Suzanne Itani and these entities.

D. **The Defendants' debarment of International Exports as an affiliate is arbitrary and capricious and not supported by substantial evidence**.

239.    The defendants purported to debar International Exports without making any findings that cause existed to debar International Exports.  The debarment order is thus arbitrary and capricious on its face.  *Stainback v. Marbus*, 671 F. Supp. 2d 126, 136 (D.D.C. 2009) ("[A] conclusion without an articulated basis for it is the essence of arbitrariness.").

240.    Defendants may not now purport to justify the debarment of International Exports based on affiliations with any other entities, or with Suzanne Itani.  The Defendants only notified International Exports that it was proposed for debarment because it was an alleged affiliate of S&S Itani.  As noted above, the DLA did not find that any affiliation with S&S Itani was a cause for debarment of International Exports.  Nor could the debarment of International Exports be based on alleged affiliation with S&S Itani or Suzanne Itani, based on alleged control by Suzanne Itani of International Exports and S&S Itani.

241.    A debarring official may only debar affiliates if they are "*affiliates of the contractor*" providing the affiliates are (1) specifically named and (2) given written notice of the proposed debarment and an opportunity to respond.  48 C.F.R. § 9.406-1(b) (emphasis added).

242.    Suzanne Itani was not a "contractor" as defined in FAR as explained above.

243.    Further, as explained in the Section IV, the evidence shows that Suzanne Itani did not and could not control S&S Itani during the relevant time period.

244.    Additionally, the Defendants only notified S&S Itani that it was proposed for debarment because it was allegedly an affiliate of Samir Itani.  There were no allegations that S&S Itani was a "contractor."

245.     Thus, any effort now to justify the Defendants' debarment of International Exports as an alleged affiliate of either Suzanne Itani or S&S Itani would be an impermissible attempt to debar the affiliate of an affiliate, which is not provided for in FAR.

246.     Nor could the debarment decision be justified now based on the notion that International Exports was allegedly a continuation of American Grocers, Inc. and S&S Itani. The Defendants never provided notice to International Exports that it could be debarred as a continuation of American Grocers, Inc. and S&S Itani.

247.     As detailed in the Section IV, International Exports is a new and different entity from S&S Itani and American Grocers, Inc. and not a mere continuation of those entities.

248.     International Exports had and has a completely new and different management team and principal employees from S&S Itani and American Grocers, Inc.  At the time of the debarment proceedings, the new management of International Exports included Erin Betts, a well-qualified CPA and MBA that was hired in 2010 to act as International Exports COO and CFO.[64]  International Exports also retained an outside CPA firm and several law firms with whom it coordinates its business practices and to discuss and address relevant business matters to ensure that the company is in compliance with the laws and regulations affecting its industry.

249.     Additionally, the Defendants did not impute any of Samir Itani's alleged conduct to International Exports.  Samir Itani was not and is not an officer, director or employee of International Exports.  Samir Itani was incarcerated in the federal prison system from January 2011 through at least July 31, 2012, further confirming that he was and is not part of any management team or a principal in International Exports.  Also, neither Samir Itani nor the Samir

---

[64] Mr. Betts resigned from International Exports effective October 31, 2012, after the DLA inexplicably threatened to debar him for being an "affiliate" of International Exports, despite praising International Exports in the debarment decision for hiring him.

Entities had or have the right to control International Exports, nor did International Exports have the right to control Samir Itani or the Samir Entities.

250.    Contrary to the clearly erroneous suggestion in the debarment decision, International Exports was not organized following the proposed debarment of American Grocers, Ltd., American Grocers, Inc. and S&S Itani.  International Exports was formed on or about March 16, 2010.  The DLA sent its letters of proposed debarment to American Grocers, Ltd., American Grocers, Inc. and S&S Itani on March 11, 2011, nearly a year after International Exports was formed and after Suzanne Itani began the wind down of American Grocers, Ltd. and S&S Itani.[65]  S&S Itani's and American Grocers, Ltd.'s existence terminated on December 29, 2011.

251.    Further, even assuming an "affiliation" existed, mere affiliation is not sufficient for the debarment of International Exports.  48 C.F.R. § 9.402(b) specifically provides that an agency may debar someone "only for the causes and in accordance with the procedures set forth in" subpart 9.400, and the FAR makes it abundantly clear that debarment requires a showing by the preponderance of the evidence that a cause for debarment under 9.406-2 exists.  Here, the Defendants did not and could not contend that the supposed innocent, unknowing affiliation constituted a cause under 9.406-2(c).  However, even assuming affiliate status exists, the mere fact that someone may be an affiliate is not a "cause of so serious or compelling a nature" to justify debarment.  Moreover, there is no finding that any alleged affiliation was a "cause" for debarment of International Exports.  Thus, the Defendants failed to allege, identify or prove any cause for debarring International Exports.  A debarment under these circumstances not only does not satisfy the legal requirements for debarment, but it is also punitive.  Simply put, there is no

---

[65] American Grocers, Inc. had already been terminated in 2000.

evidence of a cause under 9.406-2(c) or, alternatively, there is insufficient evidence of any such cause.

252.   Accordingly, no legal or evidentiary basis supports the Defendants' debarment of International Exports such that the debarment of International Exports should be overturned.

**E.    The DLA's debarment of Ziad Itani as an affiliate with S&S Itani is arbitrary and capricious and not supported by substantial evidence.**

253.   The debarment decision concluded that Ziad Itani was an affiliate with S&S Itani because Ziad Itani allegedly "controls or can control the company."  (Ex. 1, p. 12).

254.   The Defendants did not explain how they arrived at this finding that Ziad Itani controlled or could control S&S Itani.[66]  This fact alone renders the debarment arbitrary and capricious.  *See D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1195 (D.C. Cir. 2000) ("As we have often held, the requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result….") (quotations and citations omitted); *Stainback v. Marbus*, 671 F. Supp. 2d 126, 136 (D.D.C. 2009) ("[A] conclusion without an articulated basis for it is the essence of arbitrariness.").

255.   To the extent the debarment decision's terse statements suffice as an explanation of the result, the debarment is arbitrary and capricious.

256.   48 C.F.R. § 9.402(b) specifically provides that an agency may debar someone "only for the causes and in accordance with the procedures set forth in" subpart 9.400, and the FAR makes it abundantly clear that debarment requires a showing by the preponderance of the evidence that a cause for debarment under 9.406-2 exists.  Here, the Defendants contended that the supposed innocent, unknowing affiliation constituted a cause under 9.406-2(c).  However,

---

[66] The only statement the Defendants made regarding how they came to the conclusion was the following: "Ziad Itani was and is an employee and family member in these family-run businesses and this supports the finding of affiliation."  Ex. 1, p. 7.

even assuming affiliate status exists, the mere fact that someone may be an affiliate is not a "cause of so serious or compelling a nature" to justify debarment. Thus, the Defendants failed to allege, identify or prove any cause for debarring Ziad Itani. A debarment under these circumstances not only does not satisfy the legal requirements for debarment, but it is also punitive. Simply put, there is no evidence of a cause under 9.406-2(c) or, alternatively, there is insufficient evidence of any such cause.

257.    Moreover, even assuming that a mere employee other than the CEO had the power to control an entity under Texas law (which they do not), such alleged power is meaningless when the person (such as Ziad Itani) has no actual or constructive knowledge of the alleged wrongdoing giving rise to the debarment such that the person could correct the situation. A debarment under these circumstances not only does not satisfy the legal requirements for debarment, but it is also punitive.

258.    As detailed above in Section IV, the uncontroverted evidence shows that Ziad Itani did not and could not control S&S Itani.

259.    Ziad Itani was not CEO or even an officer or director of S&S Itani. Further, the evidence is clear that Ziad Itani had no ownership interest in S&S Itani.

260.    No conduct was imputed to Ziad Itani by the Defendants because he had no actual or constructive knowledge of any alleged wrongdoing.

261.    According to the debarment memorandum, Ziad Itani was debarred because he was an employee of S&S Itani. The memorandum does not say, but may be read to suggest, that he was also debarred based on his familial relationship to Samir Itani. Such facts are insufficient grounds for debarment. Notably, such facts fail to show that Ziad Itani controlled or could control S&S Itani. Additionally, the regulations do not permit the stigmatizing action of

debarment merely because an innocent individual is related to an alleged guilty individual.  In fact, if the regulations were so loose, the regulations would run afoul of Supreme Court guidance and the most basic elements of fairness. *Uphaus v. Whyman*, 360 U.S. 72, 79 (1959) ("guilt by association remains a thoroughly discredited doctrine").

262.     Further, a debarring official may only debar affiliates if they are "*affiliates of the contractor*" providing the affiliates are (1) specifically named and (2) given written notice of the proposed debarment and an opportunity to respond.  48 C.F.R. § 9.406-1(b) (emphasis added).

263.     The Defendants only notified S&S Itani that it was proposed for debarment because it was allegedly an affiliate of Samir Itani.  There were no allegations that S&S Itani was itself a "contractor."

264.     Thus, the Defendants debarment of Ziad Itani as an alleged affiliate of S&S Itani is also an impermissible attempt to debar the affiliate of an affiliate, which is not provided for in FAR.

265.     Therefore, the debarment of Ziad Itani should be overturned because there is no evidence or, alternatively, insufficient evidence that he was an affiliate of a contractor or that any cause under FAR 9.406-2 existed for his debarment.

**F.     FAR Subpart 9.4 is unconstitutionally vague as applied to Suzanne Itani, Ziad Itani and International Exports and violates Due Process as provided by Federal law and the United States Constitution, including the Fifth Amendment, because it failed to provide adequate notice that the Plaintiffs purported actions would be a violation.**

266.     The debarment decision establishes that (a) Suzanne Itani, Ziad Itani and International Exports did not participate in any alleged wrongdoing, and (b) they did not have any actual or constructive knowledge of the alleged wrongdoing.

267.     The Defendants solely relied on FAR 9.406-2(c) as the cause for debarring Suzanne Itani, Ziad Itani and International Exports.

268.    That provision, FAR 9.406-2(c), provides that a contractor may be debarred "based on any other cause of so serious or compelling a nature that it affects the present responsibility of the contractor ... ."  The regulations do not identify what constitutes a "cause of so serious or compelling a nature" to justify debarment.

269.    In the case of Suzanne Itani, Ziad Itani and International Exports, the DLA must implicitly have determined that their mere association with essentially Samir Itani was sufficient to be a "cause of so serious or compelling a nature" as to justify debarment.  The language of FAR 9.406-2 does not provide notice that mere association constitutes a "cause of so serious or compelling a nature" as would subject the Plaintiffs to debarment.  The conduct of association is not remotely similar to and does not fit the context of the provisions listing specific causes for consideration of debarment under FAR 9.406-2.

270.    If FAR 9.406-2, including FAR 9.406-2(c), were read to suggest that mere association with a debarred person was itself a "cause of so serious or compelling a nature" as to justify debarment, those regulations would fail to meet the requirements of the Due Process Clause because such a reading would make the regulation so vague and standardless that it would provide no notice of and leaves uncertain the conduct it prohibits, particularly as it was applied to Suzanne Itani, Ziad Itani and International Exports.

271.    Thus, FAR 9.406-2, including FAR 9.406-2(c), as Defendants applied it to Suzanne Itani, Ziad Itani and International Exports is vague, standardless and subject to discriminatory enforcement.  Consequently, FAR 9.406-2, including FAR 9.406-2(c), as applied was unconstitutional and violated due process as provided by Federal law and the United States Constitution, including the Fifth Amendment.

272.    Therefore, the debarment of the Plaintiffs should be overturned.

## COUNT TWO

## DEFENDANTS FAILED TO PROVIDE NOTICE TO PLAINTIFFS AS REQUIRED BY LAW AND DENIED PLAINTIFFS DUE PROCESS OF LAW AS PROVIDED BY FEDERAL LAW AND THE UNITED STATES CONSTITUTION

273.     The foregoing allegations (paragraphs 1 through 172) are incorporated herein and in each subpart below as if fully restated.

### A.     The Defendants failed to provide notice to Suzanne Itani.

274.     The Defendants only provided notice to Suzanne Itani that she was proposed for debarment as an affiliate of S&S Itani, Inc.  Thus, because that is the only basis of debarment upon which the DLA put Suzanne Itani on notice, the Defendants could only proceed on that basis.  *See* 48 C.F.R. § 9.406-3(c) ("A notice of proposed debarment **shall** be issued by the debarring official advising the contractor and any specifically named affiliates…(2) Of the reasons for the proposed debarment in terms sufficient to put the contractor on notice of the conduct or transaction(s) upon which it is based.").

275.     The Defendants never provided notice to Suzanne Itani that she (a) was an alleged affiliate of American Grocers, Inc., American Grocers, Ltd., International Grocers Inc., Itani Land Ltd, Itani Family Management Trust, Itani Ltd. Partnership, International Exports Inc., (b) did or could purportedly control American Grocers, Inc., American Grocers, Ltd., International Grocers Inc., Itani Land Ltd, Itani Family Management Trust, Itani Ltd. Partnership, International Exports Inc., (c) was an affiliate of Samir Itani "by virtue of her position in the companies and her ownership interest in them," and (d) was an affiliate because she allegedly owned American Grocers, Ltd. and American Grocers, Inc.  (Ex. 1, pp. 6, 12).

276.     Despite its failure to give notice, the Defendants erroneously (a) concluded that "S&S Itani dba American Grocers, [American Grocers, Inc., American Grocers, Ltd., International Grocers Inc.], Itani Land Ltd, Itani Family Management Trust, Itani Ltd.

Partnership, International Export[ sic] Inc. and Suzanne Itani are affiliates, because, directly or indirectly, Suzanne Itani controls or can control these companies," (b) suggested that Suzanne Itani was an affiliate of Samir Itani "by virtue of her position in the companies and her ownership interest in them," and (c) suggested that Suzanne Itani was an affiliate because she allegedly owned American Grocers, Ltd. and American Grocers, Inc. (Ex. 1, pp. 6, 12).

277.   Additionally, the Defendants never notified, as required by FAR §9.406-4(b), Suzanne Itani that the DLA would seek to debar her for an additional period of time. Consequently, the DLA failed to follow the notice procedures set forth in FAR §§9.406-3 and 9.406-4(b) with regard to assessing additional time for debarment.

278.   The failure to follow the procedures of FAR 9.406-3 and FAR 9.406-4(b) set forth above violates the law and also constitutes a denial of due process of law pursuant to Federal law and the United States Constitution, including the Fifth Amendment.

279.   Therefore, the debarment of the Suzanne Itani based on grounds that were not contained in the debarment notice letter as well as any additional period of debarment should be overturned because of lack of notice.

## B.   The Defendants failed to provide notice to International Exports.

280.   The Defendants provided notice to International Exports of only one ground for the proposed debarment which was International Exports' alleged affiliation with S&S Itani (and *only* S&S Itani) "because, (a) either one controls or has the power to control the other, or (b) a third party controls or has the power to control both."  Thus, the Defendants could only debar International Exports on that basis because that is the only basis of debarment for which the Defendants provided notice to International Exports.  *See* 48 C.F.R. § 9.406-3(c) ("A notice of proposed debarment ***shall*** be issued by the debarring official advising the contractor and any

specifically named affiliates…(2) Of the reasons for the proposed debarment in terms sufficient to put the contractor on notice of the conduct or transaction(s) upon which it is based.").

281.    The DLA's findings identify no basis as a cause for the debarment of International Exports.  But it proceeded to order International Exports' debarment, nonetheless.

282.    To the extent the DLA's debarment order suggests any basis for the debarment of International Exports—though, as noted above, its findings identify no cause for International Exports' debarment—it seems to be that (a) International Exports was an affiliate of S&S Itani and American Grocers, Inc. because it was allegedly a continuation of them, and (b) International Exports was allegedly an affiliate of American Grocers, Inc., American Grocers Limited, International Grocers, Inc., Itani Land Ltd., Itani Family Management Trust and Itani Ltd. Partnership.  (Ex. 1, pp. 8, 12).  But the DLA's notice of proposed debarment did not identify those as bases for debarment.

283.    Additionally, the Defendants never notified, as required by FAR §9.406-4(b), International Exports that the Defendants would seek to debar it for an additional period of time.  Consequently, the Defendants failed to follow the notice procedures set forth in FAR §§9.406-3 and 9.406-4(b) with regard to assessing additional time for debarment.

284.    The failure to follow the procedures of FAR 9.406-3 and FAR 9.406-4(b) set forth above violates the law and also constitutes a denial of due process of law pursuant to Federal law and the United States Constitution, including the Fifth Amendment.

285.    Therefore, the debarment of International Exports based (apparently) on suggestions that were not contained in the debarment notice letter, as well as for an additional period of debarment, should be overturned because of lack of notice.

C.      **The Defendants failed to provide notice to Ziad Itani.**

286.    The Defendants never notified, as required by FAR §9.406-4(b), Ziad Itani that the Defendants would seek to debar him for an additional period of time as required by FAR §9.406-4(b).  Consequently, the DLA failed to follow the notice procedures set forth in FAR §§9.406-3 and 9.406-4(b) with regard to assessing additional time for debarment.

287.    The failure to follow the procedures of FAR 9.406-3 and FAR 9.406-4(b) set forth above violates the law and also constitutes a denial of due process of law pursuant to Federal law and the United States Constitution, including the Fifth Amendment.

288.    Therefore, the debarment of the Ziad for any additional period of debarment should be overturned because of lack of notice.

### COUNT THREE

**DEFENDANTS' ACTIONS IN ASSESSING A 15-YEAR DEBARMENT ARE WITHOUT OBSERVANCE OF THE STANDARDS AND PROCEDURE REQUIRED BY LAW AND THE DEBARMENT IS EXCESSIVE UNDER FAR**

289.    The foregoing allegations (paragraphs 1 through 172) are incorporated herein and in each subpart below as if fully restated.

A.      **The Defendants debarment of Plaintiffs was for purposes of punishment and not in the public interest for the Government's protection.**

290.    The punitive nature of the Defendants' debarment decision is transparent in their out of hand rejection of the Plaintiffs' commitments to abstain from engaging in government contracts.

291.    The Defendants' debarment authority serves only to enforce the policy that "Agencies shall solicit offers from, award contract to and consent to subcontracts with responsible contractors only."  48 C.F.R. § 9.402.  The Plaintiffs' proposed voluntary exclusion

from government contracts would have completely removed any risk to the Defendants associated with contracting with the Plaintiffs.

292.    The Defendants' rejection of the Plaintiffs' proposed voluntary exclusion demonstrates that the Defendants' actions extended beyond the key policy concern and instead aimed to punish Plaintiffs' wholly commercial business through the collateral effects of debarment including difficulties in obtaining federal licenses and permits and the stigmatization of debarment.

293.    Accordingly, no legal or evidentiary basis supports the Defendants' debarments of Plaintiffs such that the Plaintiffs' debarments should be overturned.

**B.    The Defendants lacked authority to debar International Exports, Suzanne Itani or Ziad Itani for a period exceeding three years.**

294.    Debarment shall be for a period commensurate with the seriousness of the cause of debarment and shall not exceed three years, with two exceptions.  First, debarment "may be for a period not to exceed five years" for a violation of the Drug-Free Workplace Act of 1988. 48 C.F.R. § 9.406-4(a)(i).  Second, "[t]he debarring official may extend the debarment for an additional period, if that official determines that an extension is necessary to protect the Government's interest. However, a debarment may not be extended solely on the basis of the facts and circumstances upon which the initial debarment action was based."  *Id.* at § 9.406-4(b).

295.    The Defendants did not debar Ziad Itani, Suzanne Itani or International Exports for a violation of the Drug-Free Workplace Act.

296.    The Defendants did not extend the debarment on facts and circumstances other than the alleged facts and circumstances on which the initial debarment was based. Consequently, such an extension is prohibited by FAR 9.406(b).

297.     The Defendants purportedly extended the debarment period for the Plaintiffs based on "aggravating factors," criteria that do not exist under FAR Subpart 9.4.  These alleged "aggravating factors" were comprised of the alleged facts and circumstances upon which the initial debarment was based and, therefore, cannot be used as a basis for extending the debarment period.

298.     Further, the Defendants impermissibly debarred Ziad Itani, Suzanne Itani and International Exports for a period of fifteen years because of the allegedly "seriously improper conduct" of Samir Itani—not because of any of their conduct.  (*See* Ex. 1, pp. 12-13).

299.     The Defendants' fifteen-year debarment is arbitrary and capricious and does not follow the standards and procedures outlined by the regulations and should therefore be overturned or in the alternative reduced to no more than three years from the date the debarment was originally issued.

### C.      **Even if the Defendants had authority to impose a fifteen-year debarment, International Exports', Suzanne Itani's and Ziad Itani's debarments are not commensurate with the seriousness of the cause of their debarment.**

300.     FAR Subpart 9.4 requires "[d]ebarment shall be for a period commensurate with the seriousness of the cause(s)."  *See* 48 C.F.R. § 9.406-4(a).

301.     In this case, the alleged cause for debarment of Suzanne Itani and Ziad Itani was mere affiliation.  The DLA's findings do not identify any cause for the debarment of International Exports.

302.     The DLA did not find that International Exports, Suzanne Itani or Ziad Itani engaged in wrongful conduct.

303.     The DLA did not impute wrongful conduct to International Exports, Suzanne Itani or Ziad Itani.

304.    A mere association—as opposed to actual wrongful conduct or actual or constructive knowledge of wrongful conduct—is not a serious offense.  Indeed, it is no offense.  *Uphaus v. Whyman*, 360 U.S. 72, 79 (1959) ("guilt by association remains a thoroughly discredited doctrine").

305.    As a result, assuming debarment is appropriate (which it is not), the debarment must be for a minimal time, rather than for fifteen years—twelve years more than the maximum time allowed.

306.    Further, the debarment of fifteen years is excessive, punitive and violates the FAR.  There is no evidence in the record, or alternatively insufficient evidence, that would support the imposition of a fifteen-year debarment on Suzanne Itani, Ziad Itani or International Exports.  The Plaintiffs committed no wrongful conduct nor did they have any actual or constructive knowledge of any alleged wrongful conduct.  Given the complete lack of any culpability, the fifteen-year debarment is excessive and punitive and should be overturned.  To the extent the Defendants contend the additional twelve years of debarment are based on the bare allegations the Samir Entities supplied short shelf life food and falsified USDA and/or halal certificates, there is no evidence, or alternatively insufficient evidence, to support an additional term of debarment.  Defendants presumably base these aggravating factors on a *qui tam* complaint that indisputably is not evidence.  Contrary to the non-evidentiary allegations in the *qui tam* complaint, the information in the record refutes the allegations in the *qui tam* complaint.

307.    Therefore, the debarment of the Plaintiffs should be overturned or in the alternative reduced to no more than three years.

**D.** **Debarring mere affiliates for the same amount of time as the culpable individuals or entities is arbitrary and capricious.**

308.    The Defendants debarred International Exports, Suzanne Itani and Ziad Itani for the same period of time as it debarred Samir Itani—the only individual who the DLA actually found engaged in wrongful conduct.

309.    Debarring mere affiliates (who have done absolutely nothing wrong) for the same period of time as the individuals who allegedly committed the wrongful conduct is arbitrary and capricious.

310.    Moreover, assuming the Defendants could take such action, the basis for doing so here is not supported by substantial evidence.  The DLA based its "additional [twelve year] term" of debarment on the "seriously improper conduct" alleged in the *qui tam* action which is only the purported conduct of Samir Itani.  But, the *qui tam* complaints are merely allegations that cannot constitute substantial evidence of wrongdoing.  *Consolidated Edison Co. of New York v. National Labor Relations Board*, 305 U.S. 197, 230 (1938) ("Mere uncorroborated hearsay or rumor does not constitute substantial evidence."); *American Cancer Soc. v. Cook*, 675 F.3d 524, 529 (5th Cir. 2012) ("A complaint is not evidence of the charges contained in it.") (citations and quotations omitted); *see Tate v. District of Columbia*, 627 F.3d 904, 908 (D.C. Cir. 2010) (mere allegations in a complaint are not competent evidence and do not establish a triable fact issue).

311.    Therefore, the debarment of the Plaintiffs should be overturned or in the alternative reduced to no more than three years from the date the debarment was originally issued.

**E.**     **FAR Subpart 9.4 (as it relates to the duration of debarment) is unconstitutionally vague as applied to the Plaintiffs and violates Due Process of Law as provided by Federal law and the United States Constitution, including the Fifth Amendment, because it provides no guidelines for extending a debarment period or the duration of the extended period.**

312.     FAR Subpart 9.4 fails to meet the requirements of the Due Process Clause because it is so vague and standardless that it leaves uncertain the conduct that warrants an extension of the debarment period or the duration of such extension.  Additionally, as applied by the Defendants, the debarring official had unfettered discretion to extend the debarment period of the Plaintiffs as well as the duration of the extension such that the extension and its duration are and were subject to discriminatory enforcement.

313.     The sole basis for the debarment of Suzanne Itani and Ziad Itani was affiliation; no cause for debarment of International Exports is identified in the DLA's findings.  The Plaintiffs did not engage in any wrongdoing nor did they have either constructive or actual knowledge of any alleged wrongdoing.  Despite doing nothing wrong, the Defendants debarred the Plaintiffs for fifteen years, twelve years more than the maximum period set by FAR Subpart 9.4.

314.     The Defendants did not base the fifteen-year debarment on either FAR 9.406-4(a)(i) or FAR 9.406-4(b), the only regulatory bases to extend a debarment beyond three years.  Instead, the Defendants purportedly extended the debarment period based on "aggravating factors," criteria that do not exist under FAR Subpart 9.4.

315.     The alleged "aggravating factors" were comprised of the alleged facts and circumstances upon which the initial debarment was based and, therefore, cannot be used as a basis for extending the debarment period by the DLA.

316.     The alleged "aggravating factors" did not involve any alleged conduct of the Plaintiffs.  Thus, because the Plaintiffs conduct was completely lawful, it was impossible for the

Plaintiffs to know (let alone have notice) that their lawful conduct could subject them to debarment for a period of fifteen years.

317.    Consequently, the manner in which the Defendants applied FAR Subpart 9.4 to the Plaintiffs was arbitrary, capricious, discriminatory and unconstitutional because the Plaintiffs were denied Due Process of law as provided by Federal law and the United States Constitution, including the Fifth Amendment.

318.    Therefore, the debarment of the Plaintiffs should be overturned or in the alternative reduced to no more than three years from the date the debarment was originally issued.

**COUNT FOUR**
**DECLARATORY RELIEF**

319.    The foregoing allegations (paragraphs 1 through 172) are incorporated herein as if fully restated.

320.    A justiciable controversy has arisen with respect to the proper interpretation of 48 C.F.R. §§ 9.402(b), 9.403, 9.406-1, 9.406-2, 9.406-3, 9.406-4, and 9.406-5.

321.    Pursuant to the Declaratory Judgments Act (28 U.S.C. §§ 2201-2202), Plaintiffs seek the Court's judgment as to the Plaintiffs' and the Defendants' respective rights and obligations under 48 C.F.R. §§ 9.402(b), 9.403, 9.406-1, 9.406-2, 9.406-3, 9.406-4, 9.406-5, 9.407-3 and 9.407-4.

322.    Specifically, Plaintiffs seek the following declarations: (1) debarment of International Exports was void because it was arbitrary, capricious, unconscionable, unwarranted, an abuse of discretion, not supported by substantial evidence, and otherwise contrary to law, (2) the debarment of Suzanne Itani was void because it was arbitrary, capricious, unconscionable, unwarranted, an abuse of discretion, not supported by substantial evidence, and

otherwise contrary to law, (3) the debarment of Ziad Itani was void because it was arbitrary, capricious, unconscionable, unwarranted, an abuse of discretion, not supported by substantial evidence, and otherwise contrary to law. Plaintiffs further seek a declaration that Defendants have violated Plaintiffs' right to substantive and procedural due process under the United States Constitution in their interpretation, application and enforcement of 48 C.F.R. §§ 9.402(b), 9.403, 9.406-1, 9.406-2, 9.406-3, 9.406-4, and 9.406-5. Plaintiffs therefore request that the Court declare Defendants' debarment of Plaintiffs unconstitutional, improper, null and void, and that Defendants must remove Plaintiffs from the Excluded Parties List System and from the System for Award Management's exclusion list and any other list maintained by the U.S. Government (whether web-based or not) that identifies suspended or debarred contractors.

323. In the alternative, Plaintiffs seek the following declarations: (1) the debarments of International Exports, Suzanne Itani and Ziad Itani cannot exceed three years from the original notices of proposed debarment (*i.e.*, March 11, 2011, for Suzanne Itani, June 3, 2011, for Ziad Itani, and June 16, 2011, for International Exports) and (2) that the debarments of Plaintiffs be terminated effective March 10, 2014 (for Suzanne Itani), June 2, 2014 (for Ziad Itani) and June 15, 2014 (for International Exports).

324. Plaintiffs further seek a declaration that the Defendants cannot suspend or debar or institute suspension or debarment proceedings against an employee, supervisor, manager, officer, director, owner and partner of International Exports, Suzanne Itani and Ziad Itani as an "affiliate" when the sole basis of the proceeding is the person's mere status as an employee, supervisor, manager, officer, director, owner or partner of International Exports, Suzanne Itani and Ziad Itani.

# VI.
# REQUESTED RELIEF

Wherefore, Plaintiffs request the following:

1.  An order pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201-02 setting aside the debarment of International Exports as void because it was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and otherwise contrary to law and mandating Defendants to remove International Exports from the Excluded Parties List System and/or from the System for Award Management's exclusion list.

2.  An order pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201-02 setting aside the debarment of Suzanne Itani as void because it was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and otherwise contrary to law and mandating Defendants to remove Suzanne Itani from the Excluded Parties List System and/or from the System for Award Management's exclusion list.

3.  An order pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201-02 setting aside the debarment of Ziad Itani as void because it was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and otherwise contrary to law and mandating Defendants to remove Ziad Itani from the Excluded Parties List System and/or from the System for Award Management's exclusion list.

4.  In the alternative, an order pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201-02 setting the debarments of International Exports, Suzanne Itani, and Ziad Itani for a period not exceeding three years from the original notices of debarment, and ordering that such debarments terminated effective March 10, 2014 (for Suzanne Itani), June 2, 2014 (for Ziad Itani) and June 15, 2014 (for International Exports).

5.  An order pursuant to 28 U.S.C. §§ 2201-02 declaring that the Defendants cannot suspend or debar or institute suspension or debarment proceedings against an employee, supervisor, manager, officer, director, owner and partner of International Exports, Suzanne Itani and Ziad Itani as an "affiliate" when the sole basis of the proceeding is the person's mere status as an employee, supervisor, manager, officer, director, owner or partner of International Exports, Suzanne Itani and Ziad Itani.

Respectfully submitted,

BEIRNE, MAYNARD & PARSONS, L.L.P.

 /s/ David A. Pluchinsky            
**DAVID A. PLUCHINSKY**
Texas State Bar No. 16074400
D.D.C. Bar. No. TX0027

82

1300 Post Oak Blvd., Suite 2500
Houston, Texas  77056
Telephone:  (713) 623-0887
Facsimile:  (713) 960-1527
dpluchinsky@bmpllp.com

**ATTORNEY-IN-CHARGE FOR PLAINTIFFS**

OF COUNSEL:

BEIRNE, MAYNARD & PARSONS, L.L.P.
Don Walker
Texas Bar No. 24081196
D.D.C. Bar No. (Application for Admission Pending)
1300 Post Oak Blvd., Suite 2500
Houston, Texas  77056
Telephone:  (713) 623-0887
Facsimile:   (713) 960-1527
dwalker@bmpllp.com

KIRKLAND & ELLIS LLP
**Brant W. Bishop, P.C.**
D.D.C. Bar No. 459255
655 Fifteenth St., N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile:  (202) 879-5200
bbishop@kirkland.com