# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————

INTERNATIONAL EXPORTS, INC.,
et al.,

        Plaintiffs,

        v.

JIM MATTIS, in his official capacity
as Secretary of Defense,[1] et al.,

        Defendants.

———————————————————

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 14–2064 (RBW)

## MEMORANDUM OPINION

The plaintiffs, International Exports, Inc. ("International Exports"), Suzanne Itani, and

Ziad Itani, initiated this civil action seeking judicial review under the Administrative Procedure

Act ("APA"), 5 U.S.C. § 706 (2012), and a declaratory judgment in their favor, following the

decision of defendant Defense Logistics Agency ("Agency"), a component of the United States

Department of Defense ("Defense Department"), to debar the plaintiffs from government

contracting for fifteen years, pursuant to the Federal Acquisition Regulation ("FAR"), see

generally Original Complaint ("Compl."), that is codified, in relevant part, at 48 C.F.R. §§ 9.403

and 9.406 (2016).  Currently pending before the Court are the Defendants' Motion for Summary

Judgment, ECF No. 36 ("Defs.' Mot."), and the Plaintiffs' Motion for Partial Summary

Judgment, ECF No. 37 ("Pls.' Mot.").  Upon careful consideration of the parties' submissions,

the Court concludes that both motions must be granted in part and denied in part.[2]

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary of Defense Jim Mattis and the other named individual
defendants are automatically substituted for their predecessor officials.

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its

(continued . . . )

# I.      BACKGROUND

In July 2007, a grand jury in Houston, Texas indicted non-party Samir Itani in "a [forty-six]-count indictment [charging, in addition to other offenses,] conspiracy to defraud the government with respect to claims and with making false claims."  AR at 39; <u>see also</u> <u>id.</u> at 25–38 (Indictment).[3]  The indictment charged Samir Itani, who was then the "owner of American Grocers, Inc., a Houston company that export[ed] food and non-food products to countries in the Middle East," <u>id.</u> at 39, with submitting to the United States government false invoices that allegedly inflated the trucking costs incurred in transporting food products, <u>see</u> <u>id.</u> at 39–40.  On July 27, 2017, following Samir Itani's indictment, the Agency suspended him from entering into government contracts due to his alleged wrongdoing, as well as his wife, plaintiff Suzanne Itani, non-party S&S Itani, Inc. d/b/a American Grocers, and non-party American Grocers, Ltd, "based on their affiliation with [Samir] Itani."  <u>See</u> <u>id.</u> at 1; <u>see also</u> <u>id.</u> at 59–61 (Notice of Suspension issued to American Grocers, Ltd.); <u>id.</u> at 65–67 (Notice of Suspension issued to S&S Itani, Inc.); <u>id.</u> at 68–70 (Notice of Suspension issued to Samir Itani); <u>id.</u> at 71–73 (Notice of Suspension issued to Suzanne Itani).

---

( . . . continued)

decision: (1) the Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem."); (2) the Plaintiffs' Statement of Undisputed Material Facts in Support of Their Cross-Motion for Summary Judgment and Statement of Genuine Disputes of Material Fact Regarding the Government's Claims in Its Motion for Summary Judgment ("Pls.' Facts"); (3) the Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Mem."); (4) the Defendants' [] Oppositi[o]n to Plaint[i]ffs' Cross-Motion for Partial Summary judgment and [] Reply in Support of Defendants' Motion for Summary Judgment ("Defs.' Opp'n & Reply"); (5) the Defendants' [] Response to Plaintiffs' Statement of Undisputed Material Facts[,] Reply to Plaintiffs' Response to Defendants' Facts; and [] Response to Plaintiffs' Objections to the Administrative Record ("Defs.' Facts"); (6) the Plaintiffs' Reply Memorandum in Support of Their Motion for Summary Judgment ("Pls.' Reply"); and (7) the Certified Administrative Record submitted by the defendants ("AR").

[3] The Court notes that the indictment contained in the record is unsigned, so it is not clear from that document alone whether the indictment was actually issued by the grand jury.  However, the record contains a Department of Justice press release indicating that a grand jury returned the indictment, AR at 39, and the plaintiffs do not contest the existence of the indictment, <u>see generally</u> Pls.' Mem.

In July 2009, a superseding information issued against Samir Itani based upon the alleged false trucking charges, see id. at 80–93 (Superseding Criminal Information), to which he subsequently pleaded guilty, acknowledging his culpability for committing the offense of conspiracy to defraud the government in violation of 18 U.S.C. § 286, id. at 94–116.  A judge on the United States District Court for the Southern District of Texas sentenced Samir Itani to, inter alia, a twenty-four-month term of imprisonment.  See id. at 117–18.

While the criminal case against Samir Itani was unfolding, a separate, civil qui tam case under the False Claims Act was proceeding under seal before the same court.  See id. at 182–212 (Relator Delma Pallares's First Amended Complaint, United States ex. rel. Pallares v. Itani, Case No. H-05-3018 (S.D. Tex. June 10, 2009) ("Pallares Am. Compl.")).  The qui tam complaint named as defendants Samir Itani, Suzanne Itani, and Samir Itani's brother Ziad Itani, along with several entities in which Samir or Suzanne Itani allegedly held an ownership or management interest.  See id. at 185–86 (Pallares Am. Compl. ¶¶ 3–12).  The relator in the qui tam case, who was a former employee of the Itanis from 1996 to 2003, id. at 185 (Pallares Am. Compl. ¶ 2), alleged that the defendants engaged in a scheme to modify the expiration dates on food to be delivered "to military contractors for consumption by thousands of U.S. troops stationed in bases in Iraq, Kuwait, and Saudi Arabia," to make it appear as though the food products had longer shelf lives.  See generally id. at 195–99 (Pallares Am. Compl. ¶¶ 33–40).  The qui tam complaint made reference to a 2006 "raid" in which "[b]uckets of [a]cetone [were] [f]ound at American Grocer's [w]areheouse," which was allegedly used to alter expiration dates on food products.  See id. at 197 (Pallares Am. Compl. ¶ 38).  The qui tam complaint further alleged that

the defendants forged halal[4] and United States Department of Agriculture ("USDA") health

inspection certificates.  See generally id. at 199–201 (Pallares Am. Compl. ¶¶ 42–44).

In 2010, the parties in the qui tam action entered into a settlement agreement, see

generally id. at 228–43 (Settlement Agreement), in which Samir and Suzanne Itani, and the

defendant entities, agreed to pay $15 million to the United States to settle the claims in that case,

see id. at 230–31.  By its express terms, the settlement agreement "[was] neither an admission of

liability by [the d]efendants nor a concession by the United States that its claims [were] not well-

founded"  Id. at 230 (Settlement Agreement ¶ 5).  Instead, the parties entered into the settlement

agreement "[t]o avoid the delay, uncertainty, inconvenience, and expense of protracted litigation

of the . . . claims" asserted in the case.  Id. (Settlement Agreement ¶ 6).  The United States

agreed to release, in part, any claims under the False Claims Act arising from, among other

allegations, the Pallares qui tam complaint's allegations pertaining to the alteration of expiration

dates and falsified halal and USDA certificates.  See id. at 228–31 (Settlement Agreement ¶¶ 2–

3, 4(d)–(e), 9).

Some months later, in March 2011, the Agency issued notices of proposed debarment to

several parties, including Samir and Suzanne Itani, and S&S Itani.  Id. at 386–403.  Relevant to

the dispute before the Court, the Agency proposed to debar plaintiff Suzanne Itani due to her

affiliation with S&S Itani.  See id. at 401 ("[Samir Itani's] conviction provided grounds for his

debarment and the debarment of S&S Itani. . . .  Your affiliation with S&S Itani provides a cause

for debarment pursuant to FAR 9.406-2(c).").  In her response to the notice of the proposed

debarment, Suzanne Itani stated that "during the time covered by the indictment [of Samir Itani],

---

[4] The term "halal" denotes "selling or serving food ritually fit according to Islamic law."  Halal, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/halal?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited July 14, 2017).

between 2004 and extending to 2006, . . . [she] played no significant role in the operational aspects of S&S Itani." Id. at 450.  However, she "assumed the title of CEO of S&S Itani" in 2009, and thereafter, in 2010, "made the decision to wind down the operations of and close S&S Itani . . . as business entities." Id.  She stated that she ceased operations of S&S Itani because she "did not want to be associated with a company that had been involved in the sort of conduct in which she would not have engaged." See id. at 599.  She subsequently established plaintiff International Exports, see id. at 599 ("International Exports was founded in 2010 by Suzanne Itani."), to generate income for her family while Samir Itani was incarcerated, id.  She further stated that "[a]lthough [she was] now running a commercial business, it has nothing to do with government contracting but may well be damaged by a debarment which might exclude me from participating in government incentive programs for commercial exports to other countries." Id. at 449.

In May 2011, the Agency "supplement[ed] the administrative record," id. at 244, by including a presentation summarizing the allegations in the Pallares qui tam case, id. at 245–334, an order issued by the Southern District of Texas unsealing the complaints filed in that case, id. at 335–36, and a copy of the amended qui tam complaint, id. at 337–69.  The qui tam documents contain various allegations and purported evidence of the alleged shelf life mislabeling scheme, including allegations implicating Ziad Itani.  See, e.g., id. at 351 (Pallares Am. Compl. ¶ 33 ("If the products would expire soon, [Samir] Itani instructed employees to eradicate the dates with acetone, spray paint, or a 'Dremel' tool.  [Samir] Itani or his brother, Ziad [Itani], would then make up a new date and imprint it on the product with a special dating machine.")).  Suzanne Itani submitted a response, through counsel, to the supplemental materials.  See id. at 532–35 (June 29, 2011 letter from Suzanne Itani's counsel to the Agency).

In a June 2011 letter, the Agency proposed to debar plaintiff Ziad Itani pursuant to FAR 9.406-2(c), citing his "affiliation with S&S Itani." Id. at 456. The notice of proposed debarment also stated that, pursuant to FAR 9.406-5(b), "[t]he imputation of [S&S Itani's] seriously improper conduct to [Ziad Itani as an employee also] provide[d] a cause for debarment." Id. at 457. In addition, the Agency proposed to debar plaintiff International Exports due to its affiliation with S&S Itani. See id. at 479. Like Suzanne Itani, both Ziad Itani and International Exports responded to their proposed debarments through counsel. See id. at 536–53 (Aug. 10, 2011 letter from Ziad Itani's counsel to the Agency); id. at 599–632 (Aug. 10, 2011 letter from International Exports's counsel to the Agency).

The Agency rejected the plaintiffs' arguments against debarment in its final decision issued on September 23, 2011. See generally id. at 672–83. The debarring official imputed the misconduct underlying Samir Itani's 2009 fraud conviction to S&S Itani, id. at 681, and then debarred the plaintiffs as affiliates of S&S Itani, id. at 682. The debarring official further stated that, "[i]n addition to the fraud conviction of Samir . . . Itani, [she found] the seriously improper conduct of mislabeling food to extend the shelf life, [and] providing falsified halal and USDA certificates warrants an additional term to protect the [g]overnment's interest." Id. at 662, 668, 669 (letters from the Agency to International Exports, Suzanne Itani, and Ziad Itani, respectively). The final decision imposed a fifteen-year debarment period for each of the plaintiffs, terminating in March 2026. Id. at 662, 668, 669 (letters from the Agency to International Exports, Suzanna Itani, and Ziad Itani, respectively). "The debarments apply to procurement, nonprocurement, and sales contracting and are effective throughout the executive branch of the [f]ederal [g]overnment . . . ." Id. at 683.

## II.      STANDARD OF REVIEW

In cases seeking judicial review of agency action under the APA, "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citing Stuttering Found. of Am. v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)), aff'd, 408 F. App'x 383 (D.C. Cir. 2010). The APA requires that a court reviewing agency action "shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. "It is a widely accepted principle of administrative law that the courts base their review of an agency's actions on the materials that were before the agency at the time its decision was made." IMS, P.C. v. Alvarez, 129 F.3d 618, 623 (D.C. Cir. 1997). Due to the limited role of a court in reviewing agency action based on the administrative record, the typical summary judgment standards set forth in Federal Rule of Civil Procedure 56 do not apply. See Stuttering, 498 F. Supp. 2d at 207. Instead, "[u]nder the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" Id. (quoting Occidental Eng'g Co. v. Immigration & Naturalization Servs., 753 F.2d 766, 769–70 (9th Cir. 1985)). Thus, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law." Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quotation marks omitted).

## III.      ANALYSIS

"The FAR . . . prescribes the policies and procedures governing agency debarment of contractors." Novicki v. Cook, 946 F.2d 938, 940 (D.C. Cir. 1991). "Under the [FAR], a

contractor may be debarred for a number of reasons, including fraud in the performance of a

public contract or subcontract." <u>Id.</u>  The FAR "operates on the assumption that all individuals

with whom the government does business are persons of integrity who abide by the terms of their

government contracts." <u>Caiola v. Carroll</u>, 851 F.2d 395, 398 (D.C. Cir. 1988).  "Debarment

reduces the risk of harm to the system by eliminating the source of the risk, that is, the unethical

or incompetent contractor." <u>Id.</u> at 399.  However, the FAR "stresses that debarment is a sanction

to 'be imposed only in the public interest for the [g]overnment's protection and not for purposes

of punishment.'" <u>Id.</u> at 398 (quoting 48 C.F.R. § 9.402(b)).  "The plaintiff[s] can prevail in this

case if [they] can show that the debarring official's decision was arbitrary, capricious, an abuse

of discretion, or not otherwise in accordance with the law." <u>Textro v. Cheney</u>, 757 F. Supp. 51,

56 (D.D.C. 1991) (citing 5 U.S.C. § 706(2)(A)).  And "[t]he Court's application of the arbitrary

and capricious standard has been substantively equated with the inquiry [of] whether there was

'substantial evidence' to debar the plaintiff." <u>Id.</u>  Guided by these principles, the Court now

turns to the parties' contentions.

**A.      The Plaintiffs' Affiliation with S&S Itani as a Basis for Their Debarment**

        The defendants assert that the Agency's decision to debar the plaintiffs is unassailable

because it is based on the debarring official's authority to extend the debarment of a contractor to

any "affiliates" of the debarred contractor.  <u>See</u> Def.'s Mem. at 11–12.  The plaintiffs contend

that their debarment was arbitrary and capricious because the Agency made no finding of

wrongdoing on their part and that the FAR does not permit debarment of "affiliates of affiliates."

<u>See</u> Pl.'s Mem. at 2–3 (summarizing the plaintiffs' arguments).  Upon careful review of the

record and the FAR, the Court must reject the plaintiffs' position and conclude that the Agency's

determination to debar the plaintiffs was not arbitrary and capricious.

The FAR states that "[t]he debarring official may extend the debarment decision to include any affiliates of the [debarred] contractor if they are (1) specifically named and (2) given written notice of the proposed debarment and an opportunity to respond." 48 C.F.R. § 9.406-1(b). The term "affiliate" is defined as follows:

> Business concerns, organizations, or individuals are affiliates of each other if, directly or indirectly, (1) either one controls or has the power to control the other, or (2) a third party controls or has the power to control both. Indicia of control include, but are not limited to, interlocking management or ownership, identity of interests among family members, shared facilities and equipment, common use of employees, or a business entity organized following the debarment, suspension, or proposed debarment of a contractor which has the same or similar management, ownership, or principal employees as the contractor that was debarred, suspended, or proposed for debarment.

Id. § 9.403.

The plaintiffs were debarred based upon their affiliation with S&S Itani, see Def.'s Mem. at 9; see also AR at 682, and S&S Itani was debarred because of Samir Itani's criminal conduct resulting in his 2009 fraud conviction, see AR at 681. The genesis of this determination was the debarring official's conclusion that "[t]he imputation of [Samir] Itani's seriously improper conduct to . . . S&S Itani . . . provides a cause for [S&S Itani's] debarment." Id. (emphasis added). The Court finds no basis in the FAR to reject the Agency's finding of cause to debar S&S Itani, which was owned and operated by Samir Itani, see id. at 673 (finding that Samir Itani was one of S&S Itani's principals), and to which Samir Itani's criminal conduct was properly imputed under the FAR, see id. at 681 ("[T]he fraudulent, criminal, or other seriously improper conduct of any officer, director, shareholder, partner, employee, or other individual associated with a contractor may be imputed to the contractor when the conduct occurred in connection with the individual's performance of duties for or on behalf of the contractor, or with the contractor's knowledge, approval, or acquiescence." (quoting 48 C.F.R. § 9.406-5(a))); see also id. at 675 ("Samir Itani's conviction, which led to this action, involved deliberate fabrication of

inflated and false invoices.  His company, S&S Itani dba American Grocers carried out the

scheme.").  Plainly, therefore, S&S Itani was debarred not as an "affiliate" of Samir Itani, but

because Samir Itani's misconduct was imputed to S&S Itani under FAR 9.406-5(a).

The debarring official next decided to extend the debarment of S&S Itani to Suzanne and

Ziad Itani pursuant to the "affiliate" provision, see 48 C.F.R. § 9.406-1(b), finding that they

"directly or indirectly . . . control[] or can control" S&S Itani, AR at 682.  The final decision

explains the Agency's finding that "Suzanne Itani was at all times an officer of [S&S

Itani] . . . with power to control S&S Itani," and that Ziad Itani, Samir Itani's brother and

Suzanne Itani's brother-in-law, "was and is an employee and family member in these family-run

businesses and this supports the finding of affiliation."  Id. at 677.  The debarring official's

findings directly implicate the "indicia of control" component of 48 U.S.C. § 9.403, which

include "interlocking management or ownership" and "identity of interests among family

members."  Contrary to the plaintiffs' contentions, the Court finds nothing in the affiliate

provision requiring the debarring official to make an independent finding of an affiliate's

wrongdoing.  See Agility Def. & Gov't Servs. v. U.S. Dep't of Def., 739 F.3d 586, 590 (11th

Cir. 2013) ("The whole text of the FAR provides that an affiliate can be suspended solely based

on its affiliate status . . . .  The present responsibility of an affiliate is irrelevant."); see also

Caiola, 851 F.2d at 400 ("Debarment under FAR 9.406-2, by its terms, applies only to a

contractor. . . .  Debarment, however, may extend 'to include any affiliates of the contractor.'

The FAR states that: ['b]usiness concerns or individual are affiliates if, directly or indirectly, (a)

either one controls or can control the other or (b) a third [party] controls or can control both.'"

(citations omitted)); Leitman v. McAusland, 934 F.2d 46, 48 n.2 (4th Cir. 1991) (noting that the

plaintiffs "have not challenged the portions of the debarment decision finding that Leitman

controls or has the power to control J.L. Surplus sales, and that, <u>if Leitman was properly debarred, then J.L. Surplus was also properly debarred</u>" (emphasis added)).  <u>But see</u> <u>OSG Prod. Tankers LLC v. United States</u>, 82 Fed. Cl. 570, 578 (2008) (stating, without citation, that "[a]ffiliates must have been involved in or affected by the contractor's wrongdoing to be named in the debarment").  Instead, the provision sets forth only three conditions: that the affiliate be specifically named and notified as having been proposed for debarment and provided an opportunity to respond.  <u>See</u> 48 C.F.R. § 9.406-1(b).  There can be no serious argument on the record before the Court that those conditions were not satisfied as to Suzanne and Ziad Itani.  <u>See</u> AR at 442–53 (Suzanne Itani's response, through counsel, to the Agency's notice of proposed debarment that addresses, <u>inter alia</u>, her status as an "affiliate"); <u>see id.</u> at 536–53 (same as to Ziad Itani).

As to International Exports, the debarring official found that, "[g]iven that International Exports is a business entity organized following the proposed debarment of [American Grocers, Inc.] and S&S Itani with the same staff, labor force, and management in the person of Suzanne Itani, International Exports squarely fits in the FAR's definition of affiliates."  <u>Id.</u> at 678.  The Court also finds that this conclusion is not arbitrary and capricious for the simple reason that the FAR plainly includes, as an affiliate to whom a debarment may extend, any "business entity organized following the debarment, suspension, or proposed debarment of a contractor <u>which has the same or similar management, ownership, or principal employees</u> as the contractor that was debarred, suspended, or proposed for debarment."  48 C.F.R. § 9.403 (emphasis added).  The plaintiffs do not dispute that International Exports was organized after S&S Itani was proposed for debarment, <u>see</u> AR at 599, that Suzanne Itani was a principal of S&S Itani and is now the principal of International Exports, <u>id.</u> at 443, 599, or that Ziad Itani was employed by S&S Itani

and is now employed by International Exports, see id. at 536–37.  Indeed, Suzanne Itani stated

that one goal in establishing International Exports was to ensure that S&S Itani's former

employees would not lose their jobs.  See id. at 608 ("I also realized that I had an obligation to

the staff and labor force that had loyally worked at S&S Itani and its predecessors for many years

and who had come to depend on the company in supporting their families.").  The record also

establishes that International Exports received notice of its proposed debarment as an affiliate of

S&S Itani, id. at 479 ("International Exports['s] affiliation with S&S Itani dba American Grocers

provides a cause for debarment pursuant to FAR 9.406-2(c)."), and that it had an opportunity to

respond to the notice, see id. at 599–632 (Aug. 10, 2011 letter from International Exports'

counsel to the Agency).  And as discussed above, see supra at 9–10, the plaintiffs' argument that

the record is devoid of evidence of any wrongdoing on International Exports' part, see Pls.'

Mem. at 34–36, ignores the scope of the "affiliate" provision, which does not include as a

requirement a finding of wrongdoing by the affiliate.

 For all of these reasons, the Court concludes that the plaintiffs' motion must be denied,

and the defendants' motion must granted, as to the Agency's determination that the plaintiffs

were properly debarred as affiliates of S&S Itani.

### B. The Agency's Reliance on the Allegations in the <u>Pallares</u> <u>Qui Tam</u> Action

 The plaintiffs contend that "[i]t was arbitrary and capricious for the [Agency] to rely on

the [Pallares] qui tam materials to debar and/or extend the [p]laintiffs' debarment" because the

allegations in the qui tam complaint are themselves insufficient to constitute substantial

evidence, and because the settlement agreement disposing of the qui tam complaint expressly

disclaimed any liability for the allegations of mislabeling food and falsifying certificates.  See

Pls.' Mem. at 12–13.  Primarily, the plaintiffs vociferously challenge the reliability of the qui

tam materials as evidence of any wrongdoing and assert that much of the material constitutes

impermissible hearsay.  See id. at 13–18; Pls.' Facts at 25–30 (setting forth several challenges to

the qui tam materials included in the administrative record).

In the notices of debarment issued to the plaintiffs, the debarring official stated that she

"[found] the seriously improper conduct of mislabeling food to extend the shelf life, [and]

providing falsified halal and USDA certificates warrants an additional term to protect the

[g]overnment's interests."  AR at 662, 668, 669.  The Court understands this referenced conduct

to be the basis for the fifteen-year term of debarment, as opposed to the more standard three-year

period set forth in the FAR, see 48 C.F.R. § 9.406-4(a)(1) ("Generally, debarment should not

exceed [three] years . . . ."), not as the debarring official's basis for finding cause for the

debarment itself.  The Court will therefore limit its analysis as to this explanation to the

debarring official's decision concerning the length of the plaintiffs' debarment.

The final decision summarized the referenced "improper conduct" as follows:

> The civil qui tam lawsuit alleged [that] there was a scheme by [American Grocers,
> Inc.] that involved removing the original package expiration dates and relabeling
> . . . the expiration dates . . . to extend the shelf life of the food, forging various
> documents necessary to ship food overseas, including forged halal certificates and
> USDA health certificates.  Copies of the forged halal and USDA health certificates
> were included in supplemental materials along with copies of emails discussing the
> practice of altering of the expiration dates of the food products.

AR at 674.

The record shows that the "supplemental materials"

> included three sets of documents: (1)(a) the First Amended Complaint of Delma
> Pallares . . . , and (b) a November 29, 2010 Order of the United States District
> Court for the Southern District of Texas in which it noted the United States'
> intervention and directed the unsealing of the First Amended Complaint and other
> documents, which occurred after the matter was resolved; (2) an undated group of
> slides allegedly prepared by "U.S. Government/Berg & Androphy [the firm
> representing relator Pallares]" regarding the allegations contained in the First
> Amended Complaint . . . ; and, (3) a[n Agency] Memorandum concurring in the

recommendation to suspend Samir Itani, Suzanne Itani, S&S Itani, and American Grocers, Ltd. on the grounds that Samir Itani lacked business integrity and business honesty, based on his indictment and that the other parties were affiliated with him.

Id. at 533.  In their response to the supplemental materials, the plaintiffs urged the Agency not to

rely on the "bare allegations of a former employee which afford[] nothing of evidentiary or other

value to this or any other proceedings."  Id. at 534.  And with respect to the U.S.

Government/Berg & Androphy slides, the plaintiffs argued that they "merely parrot the

allegations in the First Amended Complaint," that "[n]othing from them constitutes evidence,"

and that no one "was afforded the opportunity to test their validity in Court or through

discovery."  Id.

Notwithstanding the plaintiffs' objections, the debarring official made the following

findings based on these materials:

In addition . . . , I note several serious aggravating factors in this case that were not addressed by the criminal conviction [of Samir Itani] but are supported by the supplemental information.  Specifically, the raid found large quantities of acetone[,] and agents observed employees removing expiration dates on the food labels.  Although counsel offered the explanation that Ziad Itani thought he was relabeling the food in order to comply with Arabic dating convention, there was no adequate explanation of the misdating to extend the product's shelf life.  Emails discussed how to calculate the longer expiration date, not how to translate dates from the American to [the] Arabic dating convention.  Additionally, there were falsified certificates found.  The blatant disregard for potential impact on the soldiers' health by supplying expired and short shelf life food with falsified USDA certificates is an aggravating circumstance.  Additionally, the use of false halal certificates to misle[a]d Muslim soldiers to believe they were upholding . . . Islamic dietary law is an aggravating factor in [t]his case and was not explained in [the plaintiffs'] response.  These business practices constitute a heinous offense on top of the fraud of which Samir . . . Itani was convicted.

Id. at 681.  The U.S. Government/Berg & Androphy slides contained in the supplemental

materials considered by the debarring official also make reference to a "raid," stating that

"[m]ore than [twenty] workers routinely altered product dates sitting at a large table at

[American Grocers'] warehouse—alteration witnessed by federal agents during [the] raid." Id. at 270.

The plaintiffs contend that the debarring official's conclusions are impermissibly based on hearsay. See Pls.' Mem. at 13. But, it is a settled principle of administrative law that, "[p]rovided that it is relevant and material, hearsay is admissible in administrative proceedings generally." Hoska v. U.S. Dep't of the Army, 677 F.2d 131, 138 (D.C. Cir. 1982).

> Not only is hearsay admissible, but under the appropriate circumstances, it may constitute substantial evidence. At one time federal courts adhered to the so-called 'residuum rule': hearsay alone could not support an agency conclusion; some 'residuum' of evidence of a type admissible in a jury trial also had to be present. This rule no longer controls. We have rejected a per se approach that brands evidence as insubstantial solely because it bears the hearsay label. Instead, we evaluate the weight each item of hearsay should receive according to the item's truthfulness, reasonableness, and credibility.

Johnson v. United States, 628 F.2d 187,190–91 (D.C. Cir. 1980) (citations omitted). Thus, the argument that the debarring official relied on hearsay, without more, does not render her decision arbitrary and capricious.

But the Court's analysis cannot end there, as the plaintiffs further argue that "[a] careful examination of the qui tam materials shows that these materials contradict the allegations they are offered to support." Pls.' Mem. at 14; see also Pls.' Facts at 25–30 (setting forth a variety of challenges to the reliability of the qui tam materials and the U.S. Government/Berg & Androphy slides, including purported inconsistencies between the allegations in the qui tam complaint and the exhibits attached to that complaint). Despite the Court's diligent search, it appears that the administrative record does not contain the exhibits submitted with the amended qui tam complaint, compelling the conclusion that the debarring official did not actually review those exhibits. Cf. Alvarez, 129 F.3d at 623 ("It is a widely accepted principle of administrative law that the courts base their review of an agency's actions on the materials that were before the

agency at the time its decision was made."). Nevertheless, the Court agrees with the plaintiffs that there are inconsistencies in the record regarding the shelf life allegations contained in the Pallares amended complaint that raise doubts about the reliability of the evidence.

Specifically, in his declaration submitted to the Agency, Ziad Itani stated:

> When shipping to Middle East countries, I understood that we had to deal with very strict customs laws of the countries to which we exported.  The company had to provide Arabic translations of all ingredient lists on the packaging.  We also had to convert dates from the dating format followed in the United States – month/date/year – to the format used in the Middle East – date/month/year.  In addition, we were often required to adjust shelf life dates to shorten them to the much stricter requirements of countries like Saudi Arabia.  For dates, depending on where they were located, we either could cover them with labels or erase them and print new dates in proper format elsewhere on the package.

AR at 550–51.  He continued:

> I believe we were quite accurate in the changes we made to conform to the customs laws of the countries to which we sent our products.  We had a quality control process that was supposed to make sure that everything was done correctly.  With millions of cases of product going through the plant each year, and having to mark the case and each of the product containers in a case, we made mistakes occasionally that were not caught by our quality control staff. . . .  I am certain we never put dates on a product to hide the fact that it was stale or out of date.  In fact, for as long as I worked for [Samir Itani], we regularly returned products to vendors which came into the plant with short shelf lives, which meant they were too short to meet our customers' requirements.

Id. at 551–52.  Furthermore, he represented:

> One of the changes Suzanne [Itani]  made was to make sure that we no longer erased dates from a package.  Instead we find a way to cover over the dates with a label and either put the new dates on the label or print the dates elsewhere on the package.  This allows the customer to see the original dating on the package.

Id. at 553.  Thus, on the one hand, the qui tam complaint alleges that product expiration dates were altered to fraudulently extend their shelf life, while on the other, Ziad Itani claims they were altered for innocent reasons.

Responding to Ziad Itani's declaration, the debarring official concluded that although he stated the dates were altered to comport with the Arabic dating convention, "there was no

adequate explanation of the misdating to extend the product's shelf life.  Emails discussed how to calculate the longer expiration date, not how to transfer dates from the American to the Arabic dating convention."  Id. at 680 (emphasis added).  Because, upon the Court's review, it appears that the administrative record does not contain the exhibits attached to the qui tam amended complaint, see generally id., the Court must conclude, based on the information in the record, that the debarring official was referring to the emails contained in the U.S. Government/Berg & Androphy slides, see id. at 245–334.  These emails therefore merit further discussion.

In one email, an individual asks, "What happens to the bad expiration dated items?  Do you put the correct dates and ship in another [container]?," id. at 297, to which Samir Itani responded, "The bad dates we will erase and ship later."  Id.  And in another email, a customer asks for "full credit" on a shipment "with double expiry, Arabic sticker – 11/2004 Printed – 05/2004," which Samir Itani agreed to provide.  Id. at 326.  These emails are consistent with the debarring official's concerns regarding the alleged modification of expiration dates as an attempt to fraudulently extend the products' shelf life.

But in another email, a customer states, "We have just been informed by our warehouse of the different expiry dates shown on the Deli Rite Corn Beef.  The expiry on the case shows 9/03 and on the sticker 1/04 which will definitely cause problems."  Id. at 325.  Samir Itani responded to this email stating: "The corn beef we [received] was chilled.  The Sep[tember] date is the sell or freeze by date.  This is not an expiry date.  The manuf[acturer] told us that once we freeze it the recommended [shelf life] is [nine] months in which case it is April 04.  Hope that helps."  Id.  In response to yet another customer complaint stating that products shipped to him were "already expired," a representative of American Grocers stated: "The dates on the [b]ologna are use or freeze by dates, the products were shipped to you frozen."  Id. at 328.

17

These emails are inconsistent with the debarring official's conclusion that "there was no adequate explanation of the misdating to extend the product's shelf life," id. at 680, because they tend to suggest, at least with respect to frozen foods, that there was a potentially adequate explanation for indicating a longer shelf life.  These inconsistencies between the allegations in the qui tam amended complaint, Ziad Itani's declaration, and the emails contained in the record raise a significant question as to the reliability of the evidence as to why shelf life dates were modified, which involves facts material to the debarring official's decision to impose an "additional term" of debarment extended to fifteen years.  See id. at 662, 668, 669.

The debarring official also concluded that the plaintiffs had falsified USDA and halal certificates, which she found constituted "aggravating circumstances," because this alleged conduct demonstrated a "blatant disregard for the potential impact on the soldiers' health," and because "the use of false halal certificates . . . misled Muslim soldiers to believe they were upholding the Islamic dietary law."  Id. at 680–81.  The plaintiffs contend that there is no evidence that the certificates were falsified or that they related to food products shipped pursuant to American Grocers' subcontracts with the United States.  See generally Pls.' Facts at 28.  The Court's review of the supplemental materials indicates that the allegedly falsified certificates were contained, like the emails discussed above, in the U.S. Government/Berg & Androphy slides.  See AR at 323–24.   But the most that the allegations in the qui tam amended complaint and the alleged false certificates suggest is that this alleged misconduct may have occurred with respect to any one of a number of potential American Grocers customers.  See generally id. at 199–201 (Pallares Am. Compl. ¶¶ 42–44) (alleging only that American Grocers used falsified USDA and halal certificates, but failing to expressly connect the allegations with the forged certificates for shipments destined for American troops).  Upon the Court's review, it must

conclude that the allegations and the excerpted certificates do not rise to the level of establishing a reliable connection between the alleged false certificates and food products targeted for delivery to American troops abroad.  Thus, there appears to be a missing factual link between the supplemental materials before the debarring official and the conclusion she ultimately reached, i.e., that the allegedly false certificates were utilized with respect to shipments headed for American soldiers overseas.

Even recognizing the defects of reliability in the supplemental materials relied upon by the debarring official to establish "aggravating circumstances" to justify a fifteen-year debarment—that is, the emails and certificates—a question exists as to whether the challenges to the materials made here were adequately raised before the Agency.  Under the APA, this Court's role is limited to "review[ing] the agency's handling of the objections put before it, not to provide a forum for new arguments based upon different facts that the petitioner could have but did not bring out below."  Sprint Commc'ns Co., L.P. v. FCC, 76 F.3d 1221, 1228 (D.C. Cir. 1996).  And while the letters submitted to the debarring official in response to the supplemental materials raise, in general terms, objections to any reliance upon the unproven allegations in the qui tam materials, see, e.g., AR at 534 ("[T]he slide show materials merely parrot the allegations in the Amended Complaint.  They were never introduced into any proceedings as far as we are aware.  Nothing from them constitutes evidence as against [Suzanne] Itani or anyone else.  Nor was anyone afforded the opportunity to test their validity in Court or through discovery.  Indeed, they are nothing but bare allegations that cannot serve as the basis to establish wrongdoing by anyone especially when the subject of the allegations were never afforded an opportunity to respond."), the responses do not delve into the level of detail provided in the plaintiffs' summary judgment-related filings, see generally Pls.' Facts at 25–30 (setting forth the plaintiffs' several

challenges to the qui tam materials).  As it does not appear to the Court that the challenges to the qui tam materials raised here could not also have been raised before the Agency, the Court cannot address those challenges at this juncture.  See, e.g., Bolack Minerals Co. v. Norton, 370 F. Supp. 2d 161, 172–73 (D.D.C. 2005) ("[The plaintiff] could have made a fact-intensive argument to the agency with the most familiarity with the record and the greatest experience with similar language in right-of-way grants, but instead has waited to search through the administrative record, piecing together a colorable argument for the first time on review.  The [agency] should have had the opportunity in the first instance to make findings on the information that [the] plaintiff identifies in the record, to hear arguments on the meaning of the information and request additional evidence if necessary, and to provide its expert views on the reading of the underlying right-of-way.  [The p]laintiff did not provide the [agency] this opportunity.").

That said, the Court finds arbitrary and capricious the debarring official's reliance on the unproven allegations in the qui tam complaint—which the plaintiffs' challenged as unproven and untested—in light of the FAR's provisions regarding fact-finding.  The parties' dispute about whether the allegations in the qui tam complaint and the materials contained in the U.S. Government/Berg & Androphy files constitute evidence of misconduct directly implicates FAR 9.406-3(d), which states:

> (1) In actions based upon a conviction or judgment, or in which there is no genuine dispute over material facts, the debarring official shall make a decision on the basis of all the information in the administrative record, including any submission made by the contractor. . . .
>
> (2)(i) In actions in which additional proceedings are necessary as to disputed facts, written findings of fact shall be prepared.  The debarring official shall base the decision on the facts as found, together with any information and argument submitted by the contractor and any other information in the record.

48 C.F.R. § 9.406-3(d).  The Agency's final decision does not appear to the Court to contain "written findings of fact," see generally AR at 672–83, and indeed, suggests by its own language that the debarring official deemed this case as one not involving any genuine disputes of fact, see id. at 678 ("Where there is no genuine dispute over material facts, the debarring official shall make a decision on the basis of all the information in the administrative record, provided the cause for debarment is established by a preponderance of the evidence, and debarment is in the public interest.").  The debarring official therefore did not pursue "additional proceedings" to address "disputed facts" as required under FAR 9.406-3(d)(2)(i).

The Court concludes that the debarring official should have discerned a genuine dispute over material facts with respect to the qui tam materials, and consequently, should have complied with FAR 9.406-3(d)(2), which expressly requires written findings of fact on disputed issues. See 48 C.F.R. § 9.406-3(d)(2)(i) ("In actions in which additional proceedings are necessary as to disputed facts, written findings of fact shall be prepared.  The debarring official shall base the decision on the facts as found, together with any information and argument submitted by the contractor and any other information in the record." (emphasis added)).  As the District of Columbia Circuit has stated, "it is elementary that an agency must adhere to its own rules and regulations.  Ad hoc departures from those rules, even to achieve laudable aims, cannot be sanctioned, . . . for therein lie the seeds of destruction of the orderliness and predictability which are the hallmarks of lawful administrative action."  Sec'y of Labor, Mine Safety & Health Admin. v. W. Fuels-Utah, Inc., 900 F.2d 318, 325 (D.C. Cir. 1990) (quoting Reuters Ltd. v. FCC, 781 F.2d 946, 950–51 (D.C. Cir. 1986)).  The debarring official's failure to make specific findings of fact as required by FAR 9.406-3(d)(2)(i) on the issue of "aggravating circumstances" warrants a remand of this case to the Agency for further proceedings regarding the allegations

that formed the basis of the debarring official's decision to impose a fifteen-year term of debarment.

## IV.    CONCLUSION

For the reasons stated above, the Court will grant in part and deny in part each party's motion for summary judgment, vacate in part the Agency's final decision imposing a fifteen-year term of debarment, and remand this case to the Agency for further proceedings consistent with this Memorandum Opinion.[5]

**SO ORDERED** this 17th day of July, 2017.

REGGIE B. WALTON
United States District Judge

---

[5] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.